LITTLE PITTSBURG CON. MIN. CO. v. LITTLE CHIEF CON. MIN. CO.

1. A correct conclusion is not to be overthrown because it is reached by illogical reasoning, or upon some grounds which are false; thus where there are sufficient facts reported by a referee, as found by him, to warrant a judgment, the judgment will not be disturbed on review.

2. When the nature of a wrongful act is such that it not only inflicts an injury, but takes away the means of proving the nature and extent of the loss, the law will aid the remedy against the wrongdoer, and supply the deficiency of proof caused by his misconduct, by making every reasonable intendment against him and in favor of the party injured. It is upon the consideration of the relative s'tuation of the parties, disclosed by the character and nature of the transaction, that the rule is adopted.

3. A principal is bound to know what an agent does in the course of his employment, and particularly so when the profits of the conduct of the agent go to the principal.

4. The scope of an agent's employment is to be determined, not alone from what the principal may have told the agent to do, but from what he knows, or, in the exercise of ordinary care and prudence, ought to know, the agent is doing in the transaction.

5. If the agent violates his duty to his principal, and is guilty of a wrong to a stranger, whereby the employer is directly and pecuniarily benefited, such wrong is in point of law the wrong of the latter.

6. Our law requires every one to know the boundaries of his own land, and, in an action *quare clausum fregit* against him for passing his boundaries and entering upon the land of his neighbor, he cannot defend by showing his ignorance of such boundary lines.

7. The burden of proof of a fact is upon him who affirms it.

8. It is good pleading to deny wholly the wrong with which one is charged, putting the party alleging it to the proof, relying upon his inability to make any proof, or proof of the whole wrong; but the fact that the party complaining does succeed in proving a part only or all the wrongs alleged is no evidence that his opponent is surprised in either fact or law.

9. A court of general jurisdiction, in passing upon the findings of law and fact contained in a referee's report in a case of trespass, sustained exceptions to several conclusions of law therein contained, and also sustained a motion to enter such a judgment as the facts proven and the law warrant. *Held*, that there was nothing in these facts, or the language used, to show that the court disregarded the findings of fact by the referee, and proceeded on its own findings.

*Appeal from District Court of Lake County.*

THE facts are stated in the opinion.

Messrs. MARKHAM, PATTERSON and THOMAS, for appellant.

Messrs. CLINTON REED and SAMUEL P. ROSE, for appellee.

MACON, C. The facts, as found by the referee and reported to the court in this case, which are material to this opinion, are these: That the appellee, some time during the year 1880, entered into and upon the premises of appellant, and extracted therefrom, and converted to appellee's use, ore amounting in value to something over

$19,000; and that some time during the latter part of 1879, and the early part of 1880, appellant entered into and upon the mining premises known as the "Little Chief Mining Claim," and extracted therefrom, and converted to its own use, ore of the value of over $37,000. The referee also found as a fact that a portion of the trespass committed by appellant upon the premises aforesaid was done while the premises were the property of appellee's immediate grantor, and a part was committed after the acquisition of title to said premises by appellee; but how much was taken from the grantor of appellee, and how much from the latter, was not shown. Upon this state of the case, the referee concluded, as matter of law, that appellee could recover nothing for the ore taken by appellant after the acquisition of title to the premises by the appellee, because of a failure of proof as to the exact extent of its loss. Upon the filing of the report appellant moved for judgment thereon, and appellee filed exceptions as to the whole report, and moved for such judgment as the facts and the law of the case warranted. The court sustained the exceptions to the report as to the first, fourth, fifth, sixth and eighth conclusions of law, and entered judgment in favor of appellee in the sum of $23,589.73. Exceptions were then filed by appellant to the finding of the referee to the effect that appellant had entered in and upon the mining premises known as the "Little Chief," and extracted therefrom ore to the value of $37,125, which being overruled, appellant filed its motion for a new trial, which also being overruled, appellant appealed to this court.

One of the assignments of error relied on by appellant is that the court sustained the exceptions of appellee to the report of the referee *in toto*, and retried the case upon the evidence found in the report; thus disregarding the facts found by the referee, and putting itself in the place of the referee, usurping the province of a jury. This view is accepted by the majority of my associates, and

upon that ground they hold that the judgment should be reversed. In this opinion I cannot concur. The majority opinion rests upon the construction of the language of the motion of appellee for judgment, and upon that of the court in the order for judgment. The language of the motion is "to enter such judgment in the cause as the facts proven and the law warrant." The language of the court is: "Now, this day comes the plaintiff herein, by Messrs. Thomas and Lyles, its attorneys, and comes the defendant herein, by Clinton Reed, Esq., its attorney; and the court, having had under advisement the exceptions of said defendant heretofore filed herein to the report of the referee in this cause, as well as its motion to vacate and set the same aside, and to hold the same for naught, and to enter such judgment in this case as the facts proven and the law warrants, and having duly considered the same, and being well advised in the premises, now sustains said exceptions as to the first, fourth, fifth, sixth and eighth conclusions of law as found by said referee, and also sustains said motion to enter such judgment in this cause as the facts proven and the law warrants." It is supposed that counsel for appellee misunderstood the practice in cases referred, and called upon the court to exercise jurisdiction to disregard the findings of fact by the referee, and to find such facts as in its opinion the referee should have found upon the whole evidence, and thereupon to render such judgment as the law of such facts warranted, and that the court fell into the same error, and usurped jurisdiction to that extent. It may be admitted that the language of the motion justifies this inference as to the counsel for appellee; but I can find no warrant for the opinion that the court mistook the law, and adopted the view of the counsel, and thereby exceeded its jurisdiction in the premises. In the first place, it is a familiar rule that courts of general jurisdiction are never presumed to have transcended their jurisdiction, and he who urges excess in this par-

ticular must show it. If the record plainly shows the fact, that is the end of the controversy as to that question; but, if the record entry is capable of a construction consistent with the presumption of jurisdiction, that construction will be adopted. In my opinion, it is impossible to find in the order any support for the position that the court accepted the supposed erroneous views of counsel for appellee, and disregarded the findings of fact by the referee, and proceeded on its own findings. The report of the referee is not set aside and held for naught as a whole; for only the first, fourth, fifth, sixth and eighth conclusions of law are set aside in terms. It seems impossible to say that that part of the report not expressly set aside was not left untouched by the court. The words, "being well advised in the premises, now sustains said exceptions as to the first, fourth, fifth, sixth and eighth conclusions of law as found by said referee," in the connection in which they are found, are to my mind as conclusive that all of the other exceptions, both as to the law and the facts reported, were left undisturbed, as if the words "the other exceptions are overruled" had been added. A judgment is the conclusion of law in a particular case announced by the court; and, while the language used by courts in pronouncing judgments is in many instances identical, yet there is no legally prescribed verbal formula which must be used for that purpose. If, in the record entry of what purports to be the judgment, enough is found upon which it can be seen that the court intended to render judgment, it will not be set aside because it is not couched in artificial and technical phraseology. But I can find in this entry of judgment no fault with the language used by the court. The clause, "and also sustains said motion to enter such judgment in the cause as the facts proven and the law warrants," does not mean any acceptance of the supposed views of counsel as to the jurisdiction of the court to find the facts, but is simply used for the purpose of identifying the mo-

tion ruled upon. It is also supposed that the clause found in this entry, to wit, "and it appearing to the court from the facts contained in the referee's report, aforesaid, that said defendant should have judgment against said plaintiff for the sum of $23,589.73, it is now by the court considered," etc., goes to show the usurpation of jurisdiction by the court below; that, in using the term "facts contained in the referee's report," the court intended such facts as, in its opinion, the testimony given at the hearing before the referee established, and not such facts as found by the referee. There is nothing to show that the court did not use this expression as synonymous with the term "facts found," but a great deal to show that, in the mind of the court, the two forms of expression were one and the same in meaning; for it is undeniable that the court accepted every finding of fact reported by the referee, and upon them founded its judgment,— the fact that each party had mined in the premises of the other, and converted large quantities of ore taken therefrom, the value of such ore so taken and converted, the date of the actual acquisition of the Little Chief premises by the appellee, the fact that a portion of the ore taken by appellant was taken before the acquisition of appellee's title to the premises, and, in short, all the facts on which the referee rested his conclusions of law. It certainly does not appear, in that clear and unequivocal way in which it should to support the view of the majority, that the court disregarded a single fact found by the referee; and in this state of the case the presumption that the court did not transcend its jurisdiction should be allowed its full force.

If, however, the court did set aside some of the facts found by the referee, if enough were left to authorize the judgment rendered, it should stand, unless there were error in applying the law to such facts. It cannot be denied that, so far as the facts found by the referee, and unquestionably accepted by the court, go, they are

sufficient to justify the judgment, unless, as already said, the court erred in the application of the law thereto. It is true that, in the opinion by the court stating the grounds of its judgment, some dissent was expressed with the finding by the referee as a fact that the plaintiff was duly incorporated under the laws of New York, and, by a compliance with the laws of Colorado, authorized to do business in this state; but this dissent was rested upon the ground of such finding, and not upon the finding itself; for the court held the stipulation entered into between the parties before the referee, and reported by him, waived or rather admitted such incorporation, and made it unnecessary to offer evidence to that point. But if it were conceded that the court below did review the entire case, and find facts not found by the referee, upon which, as well as those found by the referee, its judgment was based, and that, without such supplemental facts thus found by the court, it would have given judgment for the appellant, the judgment should not then be reversed, if it appears that the facts reported by the referee were sufficient to have justified the judgment. Such action on the part of the court would be error without prejudice only. It is clear that there were sufficient facts reported by the referee, as found by him, to warrant the judgment, without any additional facts, if the law is as I think it is. Then, did the court err in applying the law to the facts reported by the referee?

In the examination of that question I shall express no opinion upon the ruling of the court below upon the doctrine of relation, and as to the effect of the stipulation of the parties made before the referee; because, if the court erred in its opinion as to these, and still held correctly as to the duty of appellant to make out the fact that a part of the ore taken by it from the Little Chief premises did not belong to appellee, and to show how much belonged to its grantor, such errors will not reverse the judgment. A correct conclusion is not overthrown

because it is reached by illogical reasoning, or upon some grounds which are false. The ruling of the court on this point is supported by a principle which has very frequently been applied in adjudged cases, and after diligent search I have been unable to find one case in which it has not been applied in the same way as in this, upon facts of the same class and nature as those of this case. In the American note to the leading case of *Armory v. Delamirie*, 1 Smith, Lead. Cas. pt. 1, 679, the doctrine is broadly stated thus: "When the nature of a wrongful act is such that it not only inflicts an injury, but takes away the means of proving the nature and extent of the loss, the law will aid the remedy against the wrong-doer, and supply the deficiency of proof caused by his misconduct, by making every reasonable intendment against him, and in favor of the person whom he has injured. A man who wilfully places the property of another in a situation where it cannot be recovered, or its true amount or value ascertained, by mixing it with his own, or in any other manner, will consequently be compelled to bear the inconvenience of the uncertainty or confusion which he has produced, even to the extent of surrendering the whole if his share cannot be distinguished, or responding in damages for the highest value at which the property in question can reasonably be estimated;" citing *Lupton v. White*, 15 Ves. 432; *Hart v. Ten Eyck*, 2 Johns. Ch. 62, 108; *Ryder v. Hathaway*, 21 Pick. 298; *Clark v. Miller*, 4 Wend. 628; *Bailey v. Shaw*, 4 Fost. (N. H.) 297; *Preston v. Leighton*, 6 Md. 88. Here the appellant clandestinely entered into the Little Chief mining claim, under circumstances and in a way which made it practically impossible for the owner thereof to know that fact, and removed therefrom, and converted to its own use, property to the value of $37,125. It is said that part — a large part — of this property was taken from the grantor of the appellee, and a part from the appellee (which, upon the facts of this case, must be ad-

mitted); and that, as appellee affirms such wrongful taking of its property, the burden of proof of that fact is on it to show exactly how much of the ore belonged to the appellee, and that, in the absence of such exact proof, the appellant is relieved from all responsibility. In *Suydam v. Jenkins*, Sedg. Lead. Cas. 566, Duer, J , speaking for the court, says: "Unless we are greatly mistaken, there are certain indisputable rules, or, more correctly, principles of natural justice, by the application of which the amount that the injured party ought to recover may in all cases be readily and certainly determined. Setting aside the exceptional cases in which exemplary damages may be justly claimed and given, and confining ourselves to those in 'which the remedy sought is simply pecuniary, the principles which, as it seems to us, are manifestly just and universal in their application, are that the owner to whom compensation is due must be fully indemnified, and that the wrong-doer must not be permitted to derive any benefit or advantage whatever from his wrongful act.  *  *  *  An indemnity must always be given to the injured party; but it is not in all cases the measure of damages which the wrong-doer ought to pay." If the doctrine announced in the authorities above referred to is law, then it is clear that this position of appellant has no foundation on which to stand. The practical result of the rule contended for in this case is that a wrong-doer, by so committing his wrongs upon property held by two or more persons successively in point of time that no one of such persons can show with certainty what he has suffered, is to be permitted to defeat a recovery by either, and to be exempted from all responsibility for his wrongs. Such a doctrine is equally shocking to legal as to moral justice, and I believe no case can be found which supports it.

The case of *Dean v. Thwaite*, 21 Beav. 621, is exactly in point, there being no fact in that case upon which it is possible to distinguish the principle to be applied from

this. There the plaintiff brought his suit for an account-ing against defendant in the year 1855, alleging an injury upon his colliery by the defendant, and a continuous working therein, and the extraction of coal therefrom since 1840. One defense, among others set up in that case, was that a large part of the coal taken by the de-fendant was subject to the bar of the statute of lim-itations; and, though the report of the case does not expressly show that defendant insisted that plaintiff must show with certainty how much coal was taken by defendant within the statute of limitations before he could recover for anything, it is obvious from an exami-nation of the case that such defense was made and con-tested by the plaintiff. But, whether this be true or not, the rule adopted by the court is so clear, and so entirely applicable to the facts of this case, that it may well be inserted here. After the first argument of the case, the master of rolls said: "The question of liability with re-spect to the working of minerals under ground, which cannot be perceived in the same way as operations upon the surface, stands, in my opinion, in a very peculiar light; and it is very important to consider upon whom the burden of proof lies in a case of this description. In my opinion the burden of proof lies upon the wrong-doer to show that the coal has not been taken from the plaintiff's property within the time during which this court would make him accountable for it. It was im-possible for the plaintiff to ascertain that fact; it was solely within the knowledge of the defendants and their workmen. I think that the plaintiff has made out his right for an account of the coal which has been taken from his ground, subject to the question of the statute of limitations, upon which I should wish to hear a reply." It appears that argument was heard upon that question, and the master of rolls then used the following language: "I will state my opinion to-morrow. If I should be of opinion that the account should be limited to six years

before the filing of the bill, which is my present impression, the course I should probably take is this: I should direct some competent person to ascertain the amount of coal which has been taken from the plaintiff's land, and then require the defendant to show what part has not been taken within the last six years." On the next day the court delivered the final opinion thus: "I retain the opinion which I expressed yesterday, that an account ought to be directed, but that it must be confined to the coal gotten within six years before the filing of the bill. * * * There are, besides, some indications on the evidence, which weigh with me on this question, that the plaintiff was put upon inquiry, and that various circumstances existed which might have led him to take proceedings at an earlier period than he actually did, for the purpose of ascertaining the state of the works below the surface of the earth, and whether they trenched on his property. I am of opinion, therefore, that in this case the account must be confined to six years before the filing of the bill. The way I intend to deal with the account is this: I shall see if the parties themselves can agree as to the amount and extent of those workings. If they cannot, then I shall probably appoint, under the powers intrusted to me by the act of parliament (which I think extends to cases of this description), some coal agent who is perfectly well acquainted with matters of this description, to examine and make a report as to the state of the works, and as to what coal has been taken from under certain plats of land of the plaintiff, which will be specified, and to take all proper measurements for that purpose. Suppose he finds that a certain quantity, say one thousand tons, has been taken. I shall then call on the defendant to show what portion of that coal has been taken prior to the six years. I think the burden of proof ought to rest on the defendant, for this reason: I assimilate this to the case, which I have frequently had occasion to refer to, of the chimney sweep who found the

diamond ring (*Armory v. Delamirie*), and governed by the principle, which I have constantly acted upon, that the case will be taken most strongly against a person who keeps back and destroys evidence. I apply that principle to a person whose duty it was to keep strict evidence of what workings there were in other persons' lands, and shall charge a person working the coal mines on the adjoining land with the full amount raised, unless he can prove it was not taken within the time during which the court directs the account. On taking that account I shall certainly not treat this as a case of fraud, but shall act on any reasonable evidence I can get to ascertain at what time the coal was worked. This is the view I take with respect to the mode of taking the account of the coal worked."

This case calls more loudly for the application of the doctrine that the wrong-doer must suffer from the confusion he has created, or the want of evidence which he has made it impossible for his victim to produce, than did the case just quoted; because, in the latter case, there were some facts indicating that plaintiff had notice of the trespass complained of, and might have made such examination as to have discovered the extent of the wrong, and brought his suit earlier; but here there is no pretense even that appellee or its grantor had the remotest suspicion of the trespass of appellant. The fallacy of the opinion of the majority is in confounding the distinction between the burden of proof and the weight of evidence. The former is a rule of law; the latter of fact. The one belongs to the court; the other to the jury. Whether the burden of proof as to a certain fact is on the plaintiff or defendant the court will determine upon the settled rules of evidence, one of which is that the burden of maintaining any issue of fact rests upon him who, from the nature and character of the fact, has or might have peculiar information thereon. It is thought that the ruling of the court on this point rested on the fact

that appellant withheld evidence it might have produced; and that, as it was not shown by appellee that appellant had knowledge as to how much ore it took from the grantor of appellee, the ruling was erroneous, and the judgment ought not to stand.    This is a mistaken view, arising from a failure to discriminate between the case where one party actually has evidence he will not produce, and that where, from the nature of the fact in question, one party might and ought to know of the circumstances, and the other cannot be supposed to have any definite knowledge thereof.    Here the law presumes that the appellee cannot know how much ore appellant had extracted from the Little Chief mining premises before the former acquired the title thereto, because the trespass was committed under ground, in the dark, and secretly; while the law does presume that appellant does know that fact, because it might and it is its duty to know it.    It is upon the consideration of the relative situation of the parties, disclosed by the character and nature of the transaction, that the rule is adopted; and it is not set aside because the wrong-doer in any particular case may show that he does not in fact know more of the matter than the sufferer.    The same doctrine was enforced in *Mortimer v. Cradock*, 12 Law J. C. P. 166, cited in 1 Add. Torts, 561, the facts of which were that a diamond necklace of the value of £500 had been stolen, and a portion of the stones were soon afterwards found in defendant's possession.    A verdict against him for the value of the whole article was sustained.    The whole doctrine grows out of the maxim that no man shall take advantage of his own wrong, and is administered in various ways.    A familiar example is found in the confusion of goods; and in cases of tort where one tort-feasor is made to bear the burden of the whole loss, though in fact he may have received none of the fruits of the wrong.

My associates seem also to think that the fact that the

appellant, the Little Pittsburg Consolidated Mining Company, as a company, did not know of or sanction this wrong committed by its superintendent, has such force and bearing in the case as to relieve it from the necessity imposed upon it by the court. Such fact was not found by the referee, and does not appear in the record; but, if it did, it would not affect the question. A principal is bound to know what his agent does in the course of his employment, and particularly so when the profits of the conduct of such agent go in the pockets of the principal. In *Dean v. Thwaite, supra,* the defendant denied, under oath, her knowledge that she was trespassing upon the property of the plaintiff, and the court accepted her statement as true, and said, "I shall certainly not treat this as a case of fraud;" and yet enforced the rule against the defendant.

It is thought the wilfulness of the wrong committed by Bearce, appellant's superintendent, and the ignorance of the appellant of the fact until after its consummation, relieves it from the rule of evidence insisted on above; and the doctrine upon which this view is based is that, where the act of the agent is one done by him outside of the scope of his employment, for his own gratification or profit, the principal cannot be held liable for the consequences of such act. As a general proposition this may be conceded. In support of this position many cases are cited; but, as I view the law, they are inapplicable to the question under discussion. They establish the exemption of the principal from all liability to the injured party where the agent is found to have acted outside of his authority, express or implied. But here it is conceded that appellant is liable to appellee for so much of the ore as the latter may be able to show itself entitled to. The cases cited in the majority opinion hold that the principal is liable upon the ground that the servant did the wrong complained of within the scope of his employment; or that the master is not liable because the servant acted

beyond the scope of his employment.   All the cases and text-books cited on this subject go upon the ground that the act which is the cause of action results in no pecuniary profit to the principal; but no case can be found which holds that where the agent, upon his own motion, illegally takes the property of one, and gives it to his principal, the principal is not liable for such property or its value.   If, then, the appellant is liable to appellee for the act of its superintendent in the premises, does the mere fact of its receiving and converting the ore, or its value, in ignorance of the true ownership thereof, change the rule of evidence on the facts of this case?   I think not, for the following reasons:

*First.* The fact is found by the referee that appellant took and converted this ore; and that finding this court is bound to accept, because appellant accepted such finding in moving for judgment on the report, and because the evidence before the referee supports the finding.

*Second.* The superintendent, Bearce, in mining and milling the ore, acted for the appellant, and within the scope of his employment.   He did not act for himself, nor for a stranger, and it is impossible that one should act for no one.   Nor does it appear that he committed the wrong from any spirit of actual malice or hostility towards appellee or its grantor, but solely in the interest of appellant.   In all that was done by him he used the means, machinery, appliances and workmen of appellant.   Everything was done in its name.   His salary, if he was paid for his services, was paid by the appellant, and the entire profits of his operations went into the coffers of his employer.   The scope of an agent's employment is said, in *Kingsley v. Fitts,* 51 Vt. 416, "to be determined, not alone from what the principal may have told the agent to do, but from what he knows, or in the exercise of ordinary care and prudence ought to know, the agent is doing in the transaction."

*Third.* Bearce was appellant's mining superintendent,

and was clothed with the general management and control of its mining operations, with power to direct when and how the workmen in the mine should work; or he was, in this department, subject to the orders and directions of appellant. If he occupied the first position, then, as to those under his control and as to strangers he was the principal, and his acts were its acts, and his wrongs its wrongs. He was the representative of the company, as much so as would have been the president and all the other directors of the company had they exercised the same powers as the superintendent. In *Malone v. Hathaway*, 64 N. Y. 5, in discussing the doctrine of responsibility of employers, whether corporations or natural persons, for the acts and omissions of their superintendents, Allen, J., says: "Corporations necessarily acting by and through agents, thus having the superintendence of various departments, with delegated authority to employ and discharge laborers and employees, provide materials and machinery for the services of the corporation, and generally direct and control under general powers and instructions from the directors, may well be regarded as the representatives of the corporation, charged with the performance of its duty, exercising the discretion ordinarily exercised by principals, and within the limit of the delegated authority of the acting principal. These acts are in such cases the acts of the corporation; and the corporation, within adjudged cases, must respond as well to the other servants of the company as to strangers. They are treated as the general agents of the corporation in the several departments committed to their care. A person thus placed by a corporation in such a position and authority may be fairly considered as its representative *pro hac vice*." In *Corcoran v. Holbrook*, 59 N. Y. 517, the rule is thus expressed: "It is evident that this general agent was not a mere fellow-servant of the plaintiff. He was not a common hand in the mill; but that he was charged with the per-

formance of the duties which the defendants owed to the hands employed in the mill. There was no other person to discharge those duties, and defendants could not, by absenting themselves from the mill, and refraining from giving any personal attention to its conduct, but committing the entire charge of it to an agent, exonerate themselves from those duties, or from the consequences of a failure to perform them.    *    *    *    As to acts which a master or principal is bound, as such, to perform towards his employees, if he delegates the performance of them to an agent, the agent occupies the place of the master, and the latter is deemed present and liable for the manner in which they are performed." These cases were brought by servants to recover of their employers for injuries caused by the negligence of superintendents; and the question decided was that of the right of such employees to recover for the negligence of the vice-principal; but the legal consequences of such authority in the agent are as applicable to cases where strangers are injured by such agent as in those of servants. The liability of the principal arises out of the representative character of the servant, whose act or omission has caused damage. Occupying such a position, and vested with such authority, he is bound to do or prevent the doing of all acts which will protect in the one case, or injure in the other, both the employees of his principal and strangers. If he violates his duty to his principal, and is guilty of a wrong to a stranger, whereby the employer is directly and pecuniarily benefited, such wrong is in point of law the wrong of the latter, and he stands in the same legal situation as the agent would occupy were he sued for the injury. It cannot be denied that it was the duty of appellant, in mining its own territory, to respect that of its neighbors, and restrain its workmen and servants from trespassing upon such neighbors. Having delegated the entire control of its mine and miners to a superintendent, withdrawing from all

control and supervision itself, it cannot be heard to say that it was not present when the wrongs complained of were committed, and knew not of their commission. But if Bearce was not vested with this general authority, and was under the control and direction of appellant, through its board of directors or other agent, then the company is certainly bound to know what its servants were doing, and to control them.

*Fourth.* Because appellant cannot be heard to say it did not know that its superintendent was trespassing upon the premises of another. To repeat: If Bearce had such authority in the premises as to make him appellant's superintendent, then, by the rule of law which holds him to be the principal as to third persons, the question of notice is excluded from the case; but if he was less than a representative, and was directed and controlled by his principal, the latter is estopped to say it did not know that which its agent knew. The law is thoroughly settled that, as between the principal and a stranger, the former does know whatever his agent knows, learned while acting for such principal in the particular transaction. Many cases, among which are *Hart v. Bank*, 33 Vt. 252; *Dresser v. Norwood*, 17 C. B. (N. S.) 466, and *The Distilled Spirits*, 11 Wall. 356, hold that notice possessed by an agent, even though it may have been acquired prior to his agency, or in another transaction, which he is at liberty to communicate to his principal, will bind the latter. But many of the courts of this country decline to carry the doctrine to this extent, and limit its application to cases where the knowledge or notice possessed by the agent was acquired during his particular agency, and in the course of the same transaction. In *Sooy v. State*, 41 N. J. Law, 400, the court, in its discussion of the doctrine of the cases just cited, says: "The more just principle would seem to be one that aimed to award to each the benefits and burdens which would have arisen if the business had been trans-

acted by both in person. Such a result would follow if the rule to be adopted were that whenever the principal, if acting in the matter for himself, would have received the notice, the knowledge of his agent shall be chargeable to him." If we apply this rule to the facts of this case, it is at once manifest that, had the appellant done its own work in the mine, dispensing with agents and superintendents, it must have known when it crossed its boundary line and entered the Little Chief territory. Here, also, the knowledge of the superintendent, with which the appellant is chargeable, was obtained in and by the very transaction constituting the cause of action.

*Fifth.* Because, if the appellant, by its whole body of directors, had worked in its mine and ignorantly crossed into the Little Chief ground and taken and appropriated the proceeds of this ore, it would be liable therefor to the owner thereof, and would be bound to show how much of it did not belong to appellee. The entry in such case would be wrongful, though done unwittingly; and appellant, being a wrong-doer, would be subject to the rule cited above, that what is one's duty to know the law holds him to know. Neither in legal nor natural reason can there be any difference between taking the ore ignorantly and taking the value thereof without knowledge of the place from which the ore was taken; and if, in the first instance, the burden of proof would be upon appellant, it would in the last. Over the superintendent of appellant appellee had no control; with him it had no connection; between them there was no privity and no channel of communication; while he was the mere creature of appellant. It was his legal and moral duty to keep out of the premises of appellee. If he would not, but, for the direct and sole benefit of his employer, he would take the property of appellee, his duty to know how much he took is undeniable, and it is but simple justice and reason that his employer should exact of him the observance of this duty, and, failing so to do, be held

to the same obligation. Appellant is as much bound to know where the money it received came from as it would have been to know from whose ground the ore producing the money came from, had it done the mining. For this position I rely upon the case of *Dean v. Thwaite*, 21 Beav., *supra*. It is thought by my associates that the judgment of the master of rolls in that case proceeded on the notion of withholding evidence; but this is clearly a mistaken view. There, the defendant, a woman, positively denied in her answer, under oath, any knowledge that her workmen and agents had entered the land of the plaintiff, and there was no proof to overthrow this denial. Her denial was accepted as true by the court, and the master of rolls said: "I shall certainly not treat this as a case of fraud. Still, her morally honest ignorance of the fact that her servants had been taking the coal of Dean for her benefit did not relieve her from the duty of showing just how much of the whole mass was taken during the time covered, and excluded from the account by the statute of limitations." If this ruling is good law why should it not be applied to this case? It is true that the master of rolls said that he assimilated the cases to that of *Armory v. Delamirie*, which was a case in which the defendant kept back evidence; but the analogy between the two cases arose, not out of the fact that Mrs. Thwaite actually had, as the jeweler had, the evidence which she could produce, but had out of the legal duty resting upon her to know the boundaries of her own land and to know when she crossed them; from which followed the legal duty flowing from such legally imputed knowledge, to keep "strict evidence of what workings there were in other persons' lands." Certainly, our law requires every one to know the boundaries of his own land; and in an action *quare clausum fregit* against him for passing his boundaries and entering the land of his neighbor, he could not defend by showing his ignorance of such boundary lines. And whether he or

his servant acting within his employment committed the trespass is immaterial. Hence in this case, Bearce being the principal, was bound to know, and in fact did know, when he left appellant's premises, and he, as much as appellant, was bound to keep the evidence of his trespass for the benefit of the suffering neighbor.

*Sixth.* The burden of proof is upon appellant, upon the plain and well-understood rules of evidence, outside of the question of wrong-doing. It is said that the burden of proof of any fact is upon him who affirms it. This is true in a general sense. It was certainly incumbent on appellee to show, to make good its claim against appellant, that the latter had unlawfully entered upon its mining premises and removed therefrom ore. This it did. It showed that from January 2, 1880, it had been in possession of the Little Chief mining claim, under claim of ownership in fee, and that from January 10, 1880, it had the absolute fee-simple title to the property; further, that appellant had excavated in the said claim a certain area, and taken therefrom ore of the net value of $37,125, and rested. To meet and avoid the force of this proof, appellant did what in pleading would be denominated "confessing and avoiding;" that is, it showed that, notwithstanding it took all of this ore, appellee was not the owner of all of it, but that a "large part" was the property of appellee's grantor. This was clearly an affirmative defense, which appellant was bound to make good by showing, not only that some of the ore did not belong to appellee, but how much. To illustrate: Suppose appellant, instead of denying in his replication the taking of any ore from appellee, had admitted it, setting up that a large part thereof was taken from the appellee's grantor, and that for such part it had procured from grantor a release of damages, would appellant not have been called on to show accurately how much of the ore this release covered? In other words, would not such release have been an affirmative defense; and, if so, is it

any more so than the defense upon which appellant now relies?

The opinion that a new trial should be granted because the amount of ore taken from the grantor of appellee by appellant was not made an issue in the case by the pleadings, it seems to me, is quite novel, and inconsistent with the settled rules of practice. It is said that appellant, by its replication, denied the taking of any ore from the Little Chief premises, and produced considerable evidence to sustain this denial; and that as the fact that appellant had mined in the Little Chief ground, and converted ore therefrom, as well as that a part of the trespass was against appellee's grantor, was developed by the evidence before the referee, and as neither party has had an opportunity to get evidence upon this fact, both should be admitted to re-open the case so far as to produce what evidence they may upon the point. I fail to see what bearing the character or form of appellant's pleading has upon the question. By appellee's answer appellant was charged with entering upon, and removing from, the Little Chief mining claim a large quantity of valuable ore. Instead of confessing such trespass in part, and avoiding it so far as the ore belonging, at the time of its commission, to appellee's grantor went, appellant saw fit to deny *in toto* such entry and conversion, and sought to make this denial good, first, by showing it had not entered the Little Chief premises at all, and then, when that position became untenable, by showing that such entry was made before appellee owned the mine. The form of the pleading adopted by appellant certainly did not in the least affect or limit it in making its defense before the referee; for it made by its evidence the very same case as it would have made had it pleaded in confession and avoidance, as above suggested. Upon the form of the issue as to this fact, chosen by appellant, there can be no right to a new trial of that fact. If, however, it is supposed that the pleading shows that ap-

pellant had no notice of the wrongs charged in and by the answer in the case until the trial, when it was testified to by witnesses, and that it was taken by surprise, it is answered that such assumption has no basis in the theory of pleading, nor in the experience of practice. It is good pleading to deny wholly the wrong with which one is charged, putting the party alleging it to the proof, relying upon his inability to make any proof, or proof of the whole wrong; and it is the almost invariable practice to do so. But the fact that the complaining party does succeed in proving a part only or all the wrongs alleged is no evidence that the defendant is surprised in either fact or law. The answer in this case was sufficiently distinct as to dates and amounts, and in every other particular, to fully apprise appellant of the charge against it, and to enable it to prepare its defense. Nor, if we look away from the pleadings to the course of the trial before the referee, do we find any support for the notion that appellant was surprised, or was in any way unprepared to meet the trespass charged against it. The case was commenced in September, 1880, the answer was filed on the 1st day of March, 1881, and the report of the referee filed in July, 1883. Thus more than two years passed after appellant was, by the answer, plainly notified that it was charged with this wrong, before the report was filed. All of this time appellant had to inquire whether its agents or workmen had passed the boundaries of its premises, and entered those of appellee or its grantor; and from the array of witnesses it marshaled at the trial, and examined on this fact, it is evident that it was diligent. To say it could not discover at once, by a mere inspection of its mine on the side adjoining the Little Chief claim, the fact that it had entered and mined in the latter premises, is to ignore the evidence of the witnesses before the referee; and to assume it did not at once institute such inquiry is to charge it with a degree of negligence that would deprive it of any right to a new

trial. Besides, the witnesses examined by appellant upon this branch of the case were the men who did the very work of which appellee complains, or, at least, many of them were; and why it should be supposed that others can be found who will speak more definitely on this point it is difficult to understand. Further, the appellant never asked, during the progress of the examination before the referee, for a continuance on account of absent witnesses,. nor for a new trial on the ground of surprise or newly-discovered evidence. In the elaborate argument of appellant's counsel there is no hint or suggestion that a new trial for the purpose of making a better showing as to the ore taken from appellee's grantor was desired, or would be of any benefit to either party. But appellant is content to leave the fact in its present state of uncertainty, if this court will hold the law to be that appellee must show definitely how much of this wrong was perpetrated upon it, in order to a recovery of anything. Now that appellee's principal witness is dead, it would be unjust to send this case back for a retrial; because, though his testimony may be used in such trial, it will not have the same effect as his oral testimony would have. In my opinion the judgment in this case should be affirmed.

Per Curiam. The referee's report was divided into separate findings of fact and of law. The findings of fact were numbered from one to six, inclusive. By reference to the original transcript we discover that, immediately following these findings, the referee uses this language: " As conclusions of law I find." Then he adds eight or ten distinct conclusions of law, but leaves them unnumbered. In view of these circumstances, we agree with Commissioner Macon that the court intended to set aside the conclusions of law only, leaving undisturbed the referee's findings of fact. The action of the district court in designating the legal conclusions of the referee by

number does not avoid this inference. The language used in the judgment, as well as the circumstance that there is no eighth finding of fact, satisfies us that the learned commissioner's view is correct. We may admit that one or more of the conclusions of law set aside by the court were technically right. Yet, if they were not essential to the judgment, and if the judgment is fairly supported by the facts found, under established legal principles, no reversible error was committed. With this explanation we adopt the conclusion reached by Commissioner MACON in the foregoing opinion; and the judgment of the district court is accordingly affirmed.

*Affirmed.*