[No. 1769.]

WITCHER v. GIBSON ET AL.

1. PRINCIPAL AND AGENT—APPARENT AUTHORITY OF AGENT.

A principal who so negligently conducts his affairs as to lead third persons to reasonably suppose the agent has authority, may not dispute the possession of the power. He is not bound to be constantly on the lookout and watch his agent, but he is obligated to keep himself advised of the course of his business, and to know whether his agent is using the specific authority granted him, and if he is not, to advise the parties with whom he is dealing to no longer transact such business with him.

2. SAME.

A person who deals with an agent and would rely on the agent's apparent authority, must not act negligently, and must use reasonable means to ascertain whether the power is possessed, but if by a long course of dealing, a party sells goods to an agent on credit with the knowledge of the principal or under such circumstances as to charge him with knowledge, the principal is bound, although the party might have been negligent in the first instance in not inquiring into the agent's authority.

3. SAME—NOTICE.

A principal is bound to know what his agent does when the transactions are entered on his books, open to his inspection, and are exhibited to him by statements furnished by his agent.

4. SAME—ACCEPTING BENEFIT BY PRINCIPAL.

A principal may not attack the provisions of a contract by his agent, and reject in part and at his pleasure what the agent has done, when he has received an unquestioned benefit from the contract, although the agent acted without authority in making it.

5. PRINCIPAL AND AGENT—AUTHORITY OF AGENT—PRESUMPTION.

Where an agent, conducting a lumber business for his principal, continually bought goods, lumber, etc., from various dealers on credit, debited his principal with the accounts, and credited him with payments on the books, and from time to time furnished his employer with statements showing a history of the business, which statements fully advised the employer what his agent had done and was doing, to which the employer made no protest but permitted the agent to continue, the law will attach as against the employer a conclusive presumption of a grant of authority to the agent to buy on credit, and although the agent may have been originally instructed not to buy on credit, the law will presume from such a course of business a withdrawal of such instruction and a subse-

quent grant of authority, and from such course of business the
principal would be estopped to deny the authority of his agent, as
against a party who, relying on such authority, sold him goods on
credit.

6. PRACTICE—INSTRUCTIONS.

Where a party asks an instruction which the court gives, he may not
afterwards insist that the court erred in giving the instruction, and
this is true although the court may have actually refused the in-
struction asked, but gave it in his own instructions.

*Appeal from the District Court of Fremont County.*

A somewhat full and accurate statement of the proof,
given both as a naked statement, and as an argumentative
narration of what was done by the parties, will partially
serve to decide the case and leave only a brief discussion of
the law necessary to fully determine it.

In the spring of 1895, the appellant, Witcher, as owner,
was running some sawmills, and carrying on a lumber busi-
ness at Cripple Creek. In May the management of the Cripple
Creek business was changed and one Lefler was put in charge.
From that date he had the sole and exclusive management
of the business, handling the lumber which was sawed and
buying other material in the shape of Mexican and eastern
lumber and manufactured products which were necessary to
the conduct of a lumber business. None of the stuff other
than the native lumber was manufactured by Witcher. The
business became quite extensive. From a few hundred dol-
lars a month, it developed until at one time the yard transac-
tions amounted to $20,000 a month. Since the defense was
the want of authority to buy the material sued for, we must
state the terms of the appointment and the subsequent history
of the business. When Lefler was hired, he was sent down
with only these instructions : "To go down there and run
that yard, sell lumber, and get money." This was all that
Witcher said to him, according to Lefler's testimony, and
respecting it there was no substantial dispute. He concedes
that Lefler was put in charge without definite instructions,
save as he says, that he was instructed not to buy on credit.

This Lefler denies, and the circumstances very thoroughly support Lefler's version of the appointment and his conduct of the business. When he went there, there was less than $30.00 in cash on hand, some $1,400 worth of stock, and about that amount of excess of bills receivable over bills payable. Lefler commenced in June. From that time on, until the sale, in October, 1896, he ran the concern without interference or any apparent direction from Witcher. During these eighteen months he bought large quantities of eastern and Mexican lumber and manufactured material. He bought it not only of men doing business in Cripple Creek, and running similar yards, but from many wholesale dealers in Denver and other points in Colorado. It rarely happened that he bought the materials for cash. In fact such was not the custom of lumber dealers, but all raw material and manufactured products were sold by the wholesalers on time, with monthly settlements as the parties might agree. This was and is the usual course of the trade. Lefler opened a set of books. They showed the cash received and paid out, the material bought and sold, and the debits and credits. What the concern owed different parties for lumber on products, and what different persons owed them on purchases fully appeared. The books were open to Witcher, and the evidence shows, at least there is enough proof from which the jury might rightfully and reasonably conclude, Witcher was thereby advised of Lefler's course and methods. From time to time statements were taken from the books, furnished to Witcher, showing the condition of affairs, and presumably, and the evidence warrants the inference, the profit and loss account. Every six months a full statement after inventory was prepared and given to Witcher. These statements showed stock on hand, bills payable and receivable, and the net result of the business. It is therefore assumed, and the proof demonstrates it, that Witcher had full knowledge of the way in which the business was done, and of the fact that all or nearly all of the purchases were made on credit and settled either monthly or otherwise. To these proceed-

ings and to this conduct Witcher made no objection, unless as we concede, as he says, he did at one time in 1896 when he borrowed $1,300, and at another some $2,700 and furnished it to Lefler to enable him to pay for stock which he had bought. The note went to the bank and thereon Lefler paid interest. Whether he ultimately paid the note or Witcher paid it, we do not know. The orders to Lefler to buy no more on credit is disputed. What the jury found, otherwise than from the circumstances that they rendered a general verdict for the plaintiffs, we cannot ascertain. We conclude the fact was not established because thereafter the business continued, purchases were made on credit and charged on the books, to the knowledge of Witcher who subsequently made no protest, and in no manner sought to change this method. During all this time the lumber and manufactured products which were purchased were paid for by checks drawn on the bank in the name of the J. R. Witcher Lumber Company per Lefler, or per L. as the case might be, and the check book was produced showing an account was kept in the bank separate from Witcher's personal account, and it appears that he drew checks in the name of the lumber company. For some nine or ten months prior to the sale, the Gibson Lumber Company had considerable dealings with the Witcher Lumber Company. Stocks of particular sizes or sorts of lumber would need replenishment, and it was the custom of the dealers to buy and sell from each other either to fill up stock, or to enable them to fill orders. The custom seems to have been to order one from the other, and at the end of the month furnish a statement, and the debtor in the mutual transactions would settle by check. This went on for that period between these parties, and each month they had transactions of purchase and sale, though they were treated like similar transactions between persons not in the business, save as to the question of price. The J. R. Witcher Lumber Company was generally indebted to the Gibson Lumber Company and gave them nine or ten checks in the settlement of monthly accounts. In October the Gibson Company

sold the Witcher Company some $427.24 worth of lumber. It seemed to be inconvenient to settle at the usual time, and it was agreed between Gibson and Lefler that the lumber should be paid for on the 1st of January following, and he accepted a draft for the money payable at that date. Intermediate to the date of the sale and the maturity of the debt the Witcher Lumber Company became embarrassed. There was a descent on him by some of his Denver creditors, the Chicago Lumber Company having become apparently the owner of various claims by assignment of divers of his creditors, and that company attempted to force a settlement with Witcher about the middle of December, 1896. Realizing his inability to pay, and seeking to comply with their demands and get out of his troubles the best he could he gave that concern a mortgage for upwards of $12,000 on his yard and stock, some $29,000 worth of bills receivable, and possibly on a very considerable amount of sawed and native lumber at some or all of his various mills. That company went into possession, remained in possession for three or four months through Bardwell, the mortgagee and representative of the Chicago Lumber Company, who liquidated the claims which he had secured, and then turned back to Witcher some $20,000 worth of bills receivable and $6,000 or $7,000 worth of stock. At the time of the mortgage there was some dispute as to what accounts should be secured. Bardwell, an indifferent person, testified that Witcher insisted that various accounts other than those of which he was the assignee, should be included and among them the Gibson account. Bardwell testified that Witcher admitted he owed that claim and wanted to pay it, and intended to pay it, but didn't have the money as he needed what he had to pay his teamsters. This acknowledgment of the debt and promise to pay is measurably disputed by Witcher, but the preponderance of the testimony undoubtably is that he admitted the debt and agreed to pay it, and conceded it was a just claim. At all events the jury so concluded. This was the only evidence of ratification. There was no evidence that Witcher made his state-

ment with exact and full knowledge of the situation, otherwise than as he was advised by his own books and the possession of the knowledge it may be assumed he had from the admission that the debt was due and his request that it should be included in the security which he gave the Chicago Lumber Company. It may be well to note that some of the sales to Lefler by the Chicago Lumber Company were made when Witcher was present. This simply goes to show that Witcher must have had knowledge of the course of business and of what Lefler did. When the claim was not paid the Gibsons insisted on payment and sent a note for him to sign. Witcher did not object to the claim, nor did he dispute the debt, nor assert that Lefler had no right to contract it. On this testimony the case went to the jury who promptly found a verdict for the plaintiff for the amount claimed with interest from the proper date. After a motion for new trial was overruled Witcher prosecuted this appeal from the judgment.

Messrs. WALDO & DAWSON, for appellant.

Mr. SAMUEL P. DALE, for appellees.

BISSELL, P. J.

On this basis of fact the appellant has constructed a virile and persuasive argument to support his contention that where one would hold a principal for the acts of an alleged agent, he must either show an express authority delegated to the representative, or a course of conduct pursued along the lines of the due course of the particular business carried on to the knowledge and with the real or apparent consent of the principal which will estop him to deny an original grant of power. If this case is to be brought within the latter principle, he who thus deals with an agent is as much bound as in the first case to inquire about the agent's authority, and if he thereby learns or by such investigation might have found out the actual limits of the agent's power,

he may not insist that the authority was apparently possessed, and on that theory hold the principal for what the agent has done, when in fact he had no real right to act. I agree in the main with this law and concede that he whose cause of action grows out of an agent's acts, must either prove an actual power delegated, or one which may be legitimately inferred from what was done, and that the plaintiff may not sit idly by, make no inquiry, and then hold the principal on the theory of an estoppel without proof of a course of dealing with himself so long continued as to beget a legitimate reliance on the apparent possession of authority. To one or the other end must the case be worked out, if the plaintiff is to recover. The trouble with the present case is, the proof does not wholly bring it within the principle of equitable estoppel, nor yet fully establish an actual, original grant of power. Yet taken altogether, the evidence fairly establishes not only a power given when the agency was created, but one subsequently granted, or which may be fairly and legitimately inferred as granted from what the principal afterwards did or knowingly permitted the agent to do in the conduct of the business. The many transactions between the Gibson Lumber Company and the J. R. Witcher Lumber Company, even without the inquiries ordinarily requisite, permit the application of this principle of estoppel, and permit the plaintiff to insist that Witcher may not deny the agency though the Gibson Company may have been negligent and careless in failing to ascertain whether the agent had authority when they began their dealings. This comes from the culpable negligence of Witcher in the conduct of his business, a negligence so marked that it far exceeds the *culpa levissima* which may appear, and yet the principal be excused because the plaintiff's negligence proximately contributed to the loss. On either theory the verdict is supported by the proof as we shall attempt to demonstrate. We do not believe the appellant can insist that the negligence of the Gibson Lumber Company proximately contributed to the loss. It is the absence of this proof which prevents the

application of the doctrine of the Alabama case on which counsel so much rely. *Wheeler v. McGuire et al.*, 86 Ala. 398.

The theory is right. Under the law of agency, it is, and it has always been true, that a principal who so negligently conducts his affairs as to lead third persons to reasonably suppose the agent has authority may not dispute the possession of the power. As an incidental part of this principle, it is undoubtedly likewise true, as has already been suggested, the person who deals with the agent and would rely on the agent's apparent authority, must not act negligently and must use reasonable means to ascertain whether the power is possessed. The trouble with the application of that principle or of the modification of it in the present suit, is that although the Gibson Lumber Company may have been negligent in not inquiring in the first instance, the long course of dealing which the parties had, one with the other, extending over a period of months, culminating in the particular sale which is the cause of action, forbids the use of the doctrine. It is quite possible that had the sale been the first and only transaction between the parties, it might well have been said the plaintiffs were negligent in failing to find out before they sold goods on credit to Lefler that he had authority to buy. The trouble is, not only did he buy once, but for months they sold him on credit, with Witcher's probable actual knowledge. In any event he is charged with knowledge from the appearance of the transaction on the books and his failure to object. Permitting this course of dealing it begot a confidence in the Gibson Lumber Company and they had a right to rely on this apparent authority, and Witcher cannot escape the obligation. It is always incumbent on a principal to conduct his business with care. He is not bound to watch his agent, nor bound to be constantly on the lookout to see that he is not cheated. But he is certainly obligated to keep himself advised of the course of his business, and to know whether his agent is using the specific authority which is granted him, and if he is not, to advise

the parties with whom he is dealing to no longer transact such business with him. It is a general principle that the principal is bound to know what his agent does when the transactions are entered on his books, open to his inspection, exhibited to him by statements furnished by the agent, especially where the profits go into his pocket. The law of notice is broad and slight evidence under such circumstances is enough to charge him. *The L. P. C. Mining Co. v. L. C. C. M. Co.*, 11 Colo. 236; *Heinz v. Bank*, 9 Colo. App. 31.

It is equally true, as this court has many times decided, that a principal may not attack the provisions of a contract and reject in part and at his pleasure what the agent has done when he has received an unquestioned benefit. Ordinary business principles and common honesty forbid a principal to keep the product and refuse to pay, even if the agent had no authority to buy. This is and always has been the law, and there is enough in this case to warrant its application. *Drug Co. v. Lyneman*, 10 Colo. App. 249; *Sartwell v. Frost*, 122 Mass. 184; *McDowell v. McKenzie*, 65 Ga. 630 ; *Bice v. Hover*, 2 Colo. App. 172; *Johnson v. E. Car. L. & R. Co.*, 116 N. Car. 926. The case seems to us to be brought clearly within this principle which will be taken as a modification of the first or as a part of it and an exception to it, and serves to determine the rights of the parties. In this case the lumber was sold by the Gibson Lumber Company to Witcher, through Lefler, who was carrying on the business as his agent. He got the lumber. It was there when he mortgaged the stock in trade and bills receivable to pay his debts. Bardwell got it as mortgagee ; it was used for Witcher's benefit, as whatever of the stock was not sold, or whatever bills were not collected and necessary to the liquidation of these consolidated claims, went back to him. He never attempted to alter the Gibsons' status, return the goods, or in any manner alter their situation, seeming to rely wholly on the theory that the agent had no authority to buy. He put the proceeds in his pocket and relied on the want of power. Under the circumstances we do not deem it right.

Regardless, however, of all this discussion and of these principles which we have examined and stated, more to answer the argument of counsel and for their satisfaction, and not because it is vital to the decision, we believe on the record the evidence conclusively shows that Lefler had actual authority from Witcher to buy on credit. It is quite immaterial whether we believe Witcher who stated that he told Lefler originally that he must buy only for cash, and immaterial whether we believe him when he further states that subsequently and in 1896, he told him not to buy on credit. It remains true, an actual authority to buy on credit is the only legitimate inference which may be drawn from the testimony. We must hold on the proof Witcher did give Lefler this authority. If he instructed him otherwise at the commencement, that instruction was withdrawn and we must assume from the sebsequent course of business that Lefler was given actual authority as an agent to buy goods on credit. From the time Lefler took charge of the business up to the date of sale in October, 1896, he continually bought goods, lumber of all descriptions and manufactured products from various dealers on credit, debited the lumber company with the accounts, and of course credited the company with the payments when they were made. All these transactions were entered on Witcher's books. From time to time statements were furnished him showing the history of the business, the debts and liabilities of the company and its assets, consisting of stock on hand, bills payable, etc. These books and these statements thoroughly and fully advised him of what Lefler had done and was doing. He made no protest, permitted the agent to continue, and even though he may have said when he borrowed the $2,700 that Lefler must no longer do a credit business, it still appears there was no variation in the course of business, but from thence forward as before the agent constantly bought goods on credit to Witcher's knowledge. We therefore conclude the preponderance of evidence is with the appellees and Witcher was unable to establish to the satisfaction of the jury that he originally gave the instruc-

tion, or if he subsequently gave it, that he had withdrawn it. From this course of business, so long continued, so universal, to which there were no exceptions, the law will attach as against Witcher a conclusive presumption of a subsequent grant of authority to the agent to buy on credit, whatever may have been his original instructions, or whatever may have been his original delegation of power. We therefore conclude, notwithstanding the argument of the appellant that the appellees maintained the burden which the law put on them—they proved facts which established an agency with full authority to buy on credit. They likewise proved facts and a course of dealing between the parties, and such negligence on the part of Witcher, that he is now, as against them, estopped to deny that Lefler had authority to buy on credit. He must, therefore, pay the debt which his agent contracted under an authority legally presumed to have been granted, on an apparent authority exercised in the usual course of that particular business, to the knowledge of the Gibsons, and on which they had a right to rely. On this branch of the case, therefore, we conclude judgment was properly entered. There is another point insisted on by counsel for the appellant which they claim is enough to compel us to reverse the judgment.

The point is, that there was no sufficient proof of the ratification of Lefler's acts as agent to warrant the submission of the question to the jury whether as a matter of fact Witcher had ratified the purchase. We are quite ready to concede the force and the difficulty of the position. It is common law that the ratification of an agent's acts is as effectual to bind the principal as though the act had been done under an authority duly granted whether in writing or by parol. It is likewise true, as a general proposition, it is the duty of the principal to repudiate a transaction if he does not acquiesce in it. Counsel places great reliance on the statement of the supreme court, that "if he fail to do so within a reasonable time after notice, the jury may draw an inference of ratification, but no estoppel is created; if the unauthorized transaction is complete before knowledge of it reaches the alleged

principal, and the status of the parties would not be changed by the failure to approve or disapprove within a reasonable time." *Breed v. First Nat. Bank of Central City,* 4 Colo. 507. The principle is not applicable. The transaction was not complete when Witcher was first charged with knowledge of it. The goods were bought in October; they were charged on the books against the Witcher Lumber Company payable on the 1st of January following. The goods were delivered and remained in the yard until the middle of December. Presumably all this was with his knowledge, and having this knowledge he was bound to repudiate it if he would set up the want of authority. The transaction was not complete when the law presumes he knew it, although it was complete at the time of the asserted ratification. The evidence of this ratification is found wholly within the statements made by Bardwell and Lefler, or at the time the mortgage was given. At that time Witcher insisted as these witnesses assert, the Gibson claim should be secured by the mortgage. He admitted the amount was due and also that he intended to pay it but that he needed all his immediate money to pay his teamsters. The appellant has constructed an argument on this basis of fact, that there must be knowledge of all material facts and circumstances as an essential element of a ratification; if this knowledge be not apparent the principal will not be bound. On the other hand, if he had given his assent in ignorance of the facts he may on being advised disavow. We have no dispute with this law; the authorities are clear on it. It is only a question of argumentative determination whether the case is brought within their purview. We do not intend to enter this disputed field, nor attempt by analysis and statement of facts to determine whether a case has been made by the proof which will bring it exactly within these general doctrines. It is wholly unnecessary. An instruction which the court gave furnishes the only basis of the appellant's argument. It is insisted the court ought not to have given the instruction because there was no evidence to justify it. It is insisted the case being wanting in proof es-

sential to show a ratification, the court erred in leaving that question to the jury, contending therefore that an instruction given without evidence to warrant it is liable to mislead the jury and works harm. Even though we concede all these principles to the fullest extent claimed, we still should not be permitted to reverse the case. The trouble is, the appellant is in no condition to insist it was error to give that instruction. This is not true, because he failed to take an exception which he preserved; it is not because his proposition is without basis; it is not because it is doubtful whether the court ought to have given it under the proof. The whole difficulty proceeds from the circumstance that the appellant himself asked it. It is always true that where an appellant asks an instruction which the court gives, he may not thereafter insist the court erred. As we look at this record, the appellant is in that precise situation. It is quite true the court did not give the instructions as the appellant asked them. The instructions which the appellant asked were all refused, and yet the court gave instructions upon that precise proposition and in the language used by the appellant in the instructions which he requested. In other words, the appellant asked an instruction and we omit all that preceded the clause, to the effect that Witcher could in no manner be held liable unless the agent had authority to buy, unless the jury believed from the evidence that since the date of the sale he had by some means ratified the purchase, and before he can be held to have ratified the act, it must be shown by the evidence that he was familiar with all the circumstances surrounding the act, at the time of the ratification claimed. This was what the appellant asked. The court almost literally followed that language in instructing the jury. While it left out the antecedent part of the instruction, some of which was right and some of which was wrong, yet, on this proposition it heeded the appellant's request. We are wholly unable to see any distinction between a case of this sort and one where a court gives an entire instruction requested by the appellant, and he afterwards seeks when reviewing the

case to have it declared error for the court to do what he asked. The reason why this principle is so clearly applicable in the present case, is that it is only on this question of ratification that the instructions are attacked. The force and effect of the instruction on this subject is in no wise modified or changed by being made a part of an instruction on another proposition. The court instructed the jury that if they believed that Lefler had no authority to buy on credit and the plaintiffs had no reason to believe he had, they should find for the defendant unless they found that he had ratified the transaction under the legal principle which the appellant had requested him to state. This request was followed, and we believe that the appellant cannot now complain of this statement of the law, nor can he be permitted to insist the evidence did not warrant a statement of the law of ratification to the jury.

There are a number of minor errors urged in the briefs, but none of sufficient consequence to require a discussion, nor if found to be well based, of sufficient gravity and importance under the statute to warrant a reversal of the judgment.

The case was correctly tried and properly submitted to the jury. The verdict being against the appellant, the judgment entered thereon is manifestly correct and will accordingly be affirmed.

*Affirmed.*