**Merritt Victor GILMORE and Rose L. Gilmore, Plaintiffs-Appellees,**

v.

**CONSTITUTION LIFE INSURANCE COMPANY, Defendant-Appellant.**

No. 73-1963.

United States Court of Appeals, Tenth Circuit.

Argued July 11, 1974.

Decided Sept. 12, 1974.

Rehearing Denied Oct. 2, 1974.

Irvin M. Kent, Denver, Colo. (Victor T. Roushar and Petrie, Woodrow, Roushar & Weaver, Montrose, Colo., on the brief), for plaintiffs-appellees.

Kenneth L. Starr, Denver, Colo. (Hardin Holmes, James C. Ruh and Ireland, Stapleton, Pryor & Holmes, Denver, Colo., on the brief), for defendant-appellant.

Before BREITENSTEIN, McWILLIAMS and BARRETT, Circuit Judges.

McWILLIAMS, Circuit Judge.

This is an agency case wherein the trial court held the principal liable for the fraud of its agent on the grounds that the principal had clothed its agent with such authority that the agent was apparently acting within the scope of his authority when he committed the fraudulent acts upon which the present action is based. The trial court accordingly entered judgment against the principal and the latter now appeals. We affirm.

The agent's fraud is undisputed and the only issue is the principal's liability therefor. In our view the trial court's ultimate findings are supported by the record and in reaching its conclusions the trial court did not misapprehend or misapply the local Colorado law bearing on the question of the apparent authority of an agent. Let us examine the events out of which the present controversy arises.

In 1952, Merritt Victor Gilmore purchased a policy of life insurance from the Sterling Life Insurance Company. Gilmore, a resident of Montrose, Colorado, is a retired trucker who before his retirement operated a trucking business on Colorado's western slope hauling uranium for Union Carbide from 1949–63. Gilmore had only an eighth grade education and at the time of trial had been retired for several years. The policy of insurance thus purchased in 1952 had a maturity date of September 29, 1969, and a maturity value of $15,880. Sometime after issuing Gilmore the policy of insurance, Sterling Life Insurance Company was acquired by the Constitution Life Insurance Company.

The Constitution Life Insurance Company is a corporation organized under the laws of Illinois with its principal place of business in that state and it is authorized to transact business in Colorado. One Lejzor Bryks, a resident of Denver, was a general agent for Constitution in the state of Colorado from 1958 till October 7, 1971, when Constitution terminated the relationship. On December 15, 1971, Bryks committed suicide.

Gilmore first met Bryks in May 1968, when Bryks came to the Gilmore residence in Montrose, Colorado, introducing himself as an agent for Constitution and offering to assist Gilmore in connection with his insurance needs. Specifically, Bryks at their first meeting in May 1968 advised Gilmore that if he paid his annual premium payment on the old Sterling policy at that time, instead of waiting till September 1968, he would be able to obtain the full maturity cash value of the policy in September 1968, even though the maturity date of the policy of the policy was September 1969. This was admittedly a false representation by Bryks. Gilmore, however, relied on Bryks' statement, and thereupon made out his personal check in favor of Constitution for the annual premium, otherwise due in September 1968, which he gave to Bryks. Bryks later endorsed this check on behalf of Constitution and deposited it in an account in the Cherry Creek National Bank, Denver, Colorado. This account plays a rather prominent role in this dispute, and brief reference thereto should be made at this point.

In April 1964 Constitution authorized Bryks, its general agent, to open an account in its name in the Cherry Creek National Bank, with Bryks having the authority to deposit in that account checks made payable to Constitution, and also having the authority to draw on the account, both on his sole signature. Accordingly, as previously mentioned, the premium check which Gilmore gave Bryks in May 1968 was deposited by Bryks in Constitution's account in the Cherry Creek National Bank. Gilmore also purchased a health and accident policy from Constitution through Bryks in September 1968, and the premium for this policy was paid for at that time by a check made payable to Constitution which Bryks deposited in Constitution's account in Cherry Creek National.

In September 1968 Bryks again journeyed to Montrose from Denver and presented Gilmore with a blank form for him to sign for the purpose of cashing in his old Sterling policy, which was now the obligation of Constitution. Gilmore signed the form in blank and gave it to Bryks to complete and transmit to Constitution. Gilmore anticipated, based on Bryks' representation, that he would receive in excess of $15,500 on the surrender of his policy, such being its *full* maturity value. However, when Bryks filled out the application form which Gilmore had signed in blank, the amount that was to be received was only $14,659.40, which was its value as of September 1968.

In due time Constitution prepared a check in the amount of $14,659.40 payable to Gilmore and gave the check to Bryks for delivery to Gilmore. Bryks, however, did not deliver the check to Gilmore, but forged Gilmore's endorsement and deposited it in the Cherry Creek National Bank account. Bryks

then contacted Gilmore and persuaded Gilmore not to take the entire amount of his policy in cash, but to take $10,000 of these proceeds and buy a so-called "certificate" which would draw 8% interest. Gilmore agreed to this, and accepted a $10,000 certificate and a check for $5,569.30 for the balance due on the surrender of his Sterling policy, the total of these two amounts equalling the *full* maturity value of the policy. In buying the certificate Gilmore testified that he thought he was "investing" or "lending" to Constitution. It subsequently developed that these certificates were Bryks' own invention, and that Constitution had no knowledge of Bryks' activities in thus selling certificates, which he apparently sold not only to Gilmore, but to others as well.

In December 1968 Bryks suggested to Gilmore that he buy another $5000 certificate, which he did. And again, in June 1969, at Bryks' suggestion Gilmore bought another $5000 certificate. In each instance Gilmore paid for the certificate with a check made payable to Constitution, which Bryks then deposited in the Cherry Creek bank account.

Bryks paid Gilmore interest on these certificates commencing with the issuance of the first certificate and continuing through December 1971. During 1969, for example, Gilmore received $1400 as interest on the certificates, and at the end of 1969 he received in the mail a Form 1099 showing the amount of $1400 as interest for him to report on his income tax. This form was stamped in the "By Whom Paid" blank with

"Constitution Life Insurance Co.
Rocky Mountain States District Office
1637 Race Street
Denver 6, Colorado."

On October 29, 1971, Bryks wrote Gilmore and enclosed one certificate for $20,000, requesting that Gilmore return the three outstanding certificates, which totaled $20,000. This Gilmore did. As indicated, Bryks committed suicide in December 1971, and when the interest payments were no longer forthcoming,

Gilmore contacted Constitution. The latter denied knowledge of its agent's fraud and disavowed liability on its part.

It was in this setting that Gilmore brought suit against Constitution, seeking to recover the $20,000 that he had given Bryks in return for the three certificates. Suit was brought in the District Court for Montrose County, State of Colorado, but was removed to the federal court by Constitution. At trial Gilmore did not, and could not, produce the first three certificates which he had purchased from Bryks. As indicated, these three had been surrendered to Bryks in return for the one $20,000 certificate. The latter certificate was produced upon trial. This fourth certificate made no reference, as such, to Constitution, but did recite that Gilmore had previously given Bryks $20,000 "towards *our* special fund on which *we* are paying 8% interest per annum" (emphasis added). Gilmore had no recollection as to the exact language used in the first three certificates, though they were said to be similar in appearance to the fourth certificate. He did recall, however, that the first three certificates, unlike the fourth, were on Constitution's stationery and bore a Lawrence Street address in Chicago, Illinois.

Trial of this matter was to the court. After all the evidence was in, the trial court suggested to the parties that the evidence was not really in great dispute and directed counsel to draw up stipulated findings of fact. This was done, and such were then adopted by the trial court as its findings. As mentioned earlier, the trial court concluded that in selling the certificates to Gilmore, Bryks was acting within his apparent authority as a general agent for Constitution, and accordingly entered judgment for Gilmore against Constitution in the amount of $10,960.92 and costs. Gilmore's original claim had been reduced by the sum of $10,000 which he had received from Cherry Creek National Bank by way of settlement, the bank having previously accepted for deposit

the check bearing Gilmore's forged endorsement. It is this judgment, which includes the two $5000 payments which Gilmore made in December 1968 and in June 1969 for so-called certificates, plus interest thereon, that Constitution now appeals.

■■ As above indicated, at the conclusion of the trial the judge directed counsel to prepare a stipulated findings of fact. This counsel did, and the trial judge then accepted the stipulated findings as his own. However, the trial court then proceeded to make certain conclusions, which were in a sense ultimate findings of fact. It was in these conclusions that the trial court held that Constitution had clothed its agent, Bryks, with such authority that in committing the frauds against Gilmore in December 1968 and June 1969, Bryks was apparently acting within his authority as a general agent for Constitution and that the latter was accordingly liable to Gilmore. In our view the record supports the trial court's resolution of this matter.

At the outset of our discussion we would recognize the argument particularly stressed by Constitution in this court, namely, that Constitution had no authority to itself sell certificates; that it followed that under no circumstance could Bryks have authority, be it express or implied, to sell certificates; and that the selling of certificates was so foreign to the business of the principal, which was selling insurance, that the very nature of the transaction complained of negated even a suggestion that Bryks had apparent authority to sell certificates to Gilmore. We do not agree that Bryks' selling of certificates to Gilmore was so far removed from his principal's business that as a matter of law it must be said that he was acting without and beyond his apparent authority.

In the first place, Constitution entrusted its agent, Bryks, with the proceeds of the Sterling policy for delivery to Gilmore. If Constitution had mailed the check to Gilmore, Bryks' fraud scheme would have been nipped in the very beginning. The fact that the check was made payable to Gilmore, and that Constitution had no reason to expect that Bryks would forge Gilmore's endorsement, does not deny the fact that Constitution nonetheless wanted its agent to personally deliver the proceeds of his policy to Gilmore. And when an agent is delivering a check for the proceeds of an insurance policy to its erstwhile policyholder, to us it would be normal, and not highly unusual, for the agent to attempt to persuade the policyholder to reinvest with the company, in one way or another, at least a portion of the proceeds of the surrendered policy. "Buying a Piece of the Rock," for example, is virtually a household expression at the moment. So, when Bryks had some $14,000 for delivery to Gilmore, it was as we see it a normal, natural thing for him to attempt to interest Gilmore in "lending," or "investing," at least a portion of the proceeds with his principal, at an attractive 8% interest rate. Under all the circumstances, this then is but one of the factors to be considered in determining whether the record, considered in its entirety, supports a finding of apparent authority. We will now list the factors which in our view support a finding of apparent authority.

■ First: Bryks was a general agent for Constitution for some thirteen years, and during that time Constitution's supervision of Bryks lay somewhere between minimal and nonexistent. We recognize that a principal is not responsible for any and all acts of his agent, regardless of whether such are within or without the agent's authority. At the same time, a principal may not accept the benefits of its agent's endeavors, and reject out of hand detriments arising therefrom. In other words, a principal may not turn loose his agent on the general public, and then merely sit back and exercise little or no supervision. In this regard, see, for example,

Witcher v. Gibson, 15 Colo.App. 163, 61 P. 192 (1900), where appears the following:

"* * * It is always incumbent on * * * [a principal] to conduct his business with care. He is not bound to watch his agent, nor bound to be constantly on the lookout to see that he is not cheated. But he is certainly obligated to keep himself advised of the course of his business, and to know whether his agent is using the specific authority which is granted him, and, if he is not, to advise the parties with whom he is dealing to no longer transact such business with him. * * * *"

The foregoing quotation was cited with approval by the Colorado Supreme Court in Zeller v. Taylor, 95 Colo. 503, 37 P.2d 391 (1934).

Second: Bryks, as Constitution's general agent, first contacted Gilmore at the latter's home in Montrose, holding himself out as a general agent for Constitution, which he was, and offering to aid Gilmore in his insurance program.

Third: As mentioned above, Constitution entrusted Bryks with the personal delivery to Gilmore of the proceeds of the Sterling policy, thereby setting in motion the chain of events which resulted in the Gilmores being defrauded of $20,000.

Fourth: Constitution authorized Bryks to open an account in the Cherry Creek National Bank in its name, with Bryks having the sole and uncontrolled authority to make deposits to such account and to draw thereon. Bryks had "free rein" with this account, and Constitution never ran an audit on the account carried in its name in the Cherry Creek National Bank at any time. Hence, Bryks was able to endorse and then deposit the numerous checks which Gilmore made payable to Constitution, including, for example, Gilmore's last annual premium payment on the Sterling policy, the premiums due on several health and accident policies which Gilmore bought of Constitution through

Bryks, not to mention the two checks for $5000 each with which he purchased certificates in December 1968 and June 1969. Similarly, the balance of the proceeds realized from the surrender of the Sterling policy, exclusive of the first certificate in the amount of $10,000, was paid by a check drawn on this account. So, Constitution authorized Bryks to maintain an account in its name and permitted Bryks to so manipulate this account that a third person, such as Gilmore, would reasonably believe that Bryks had authority to accept the checks which Gilmore gave for the certificates.

Fifth: The certificates which Gilmore purchased were on Constitution's letterheads, which Constitution apparently permitted its agent to have and to use as he saw fit.

Sixth: Interest payments on the certificates were represented by checks drawn on the Cherry Creek bank account. And yearly statements as to interest earned on the certificates were given Gilmore which reflected in the "By Whom Paid" blank that it was Constitution which was paying the interest. In preparing these statements, Bryks apparently had access to a stamp bearing the name of "Constitution Life Insurance Company," which gave Bryks' street address in Denver as the address for Constitution's "Rocky Mountain States District Office."

Without further extending this opinion with our analysis of the evidence bearing upon the trial court's ultimate finding of apparent authority, we conclude that the record does support such and that on appeal we are not at liberty to disturb it. In System Investment Corp. v. Montview Acceptance Corp., 355 F.2d 463 (10th Cir. 1966), a diversity case arising in Colorado, we observed that apparent authority of an agent to do an act is created as to third persons, such as Gilmore in the instant case, not only by written or spoken words by the principal, but also may be created by any conduct of the principal which, reasonably interpreted, causes

such third person to believe that the principal consents to have the act done on his behalf by the one purporting to act for him. In this regard, for example, the authorization given Bryks to open an account in Cherry Creek National Bank in Constitution's name so as to permit the deposit therein of any check made payable to Constitution is of significance. Such enabled Bryks, for example, to deposit premium payments made to Constitution by Gilmore and delivered to Bryks, and at the same time to handle in the similar fashion the payments subsequently made to Bryks for the certificates, such payments also being in the form of a personal check made payable to Constitution. *See also,* Westinghouse Credit Corporation v. Green, 384 F.2d 298 (10th Cir. 1967). To the same effect in another diversity case arising out of Colorado, *see* Thomas v. Colorado Trust Deed Funds, Inc., 366 F.2d 140 (10th Cir. 1966), where we recognized the general rule that a principal is responsible for the fraudulent acts of an agent whom he has put in a position to perpetrate the fraud complained of.

We regard the trial court's finding of apparent authority to be an ultimate finding of fact that cannot be disturbed by us on review unless it be "clearly erroneous." There is a suggestion that since counsel submitted stipulated findings of fact which were adopted by the trial court that this is not a situation where the "clearly erroneous" rule should be applied and that we are free to make our own resolution of the matter. We do not agree.

■■ The question of an agent's authority to act on behalf of his principal is ordinarily one of fact. System Investment Corp. v. Montview Acceptance Corp., *supra,* and J. T. Majors & Son, Inc. v. Lippert Bros. Inc., 263 F.2d 650 (10th Cir. 1958). As indicated, there was a complete trial of this case to the trial court, and it was only after all the evidence was in that the trial court suggested to counsel that they attempt to draw up a stipulated findings of fact. This stipulation was in reality but a recitation in summary form of the evidence adduced by both sides upon trial. As a preface to the stipulation, counsel simply agreed that the several "findings" were "supported" by evidence presented to the trial court, but did not agree that such "findings" were necessarily "relevant," nor that such had necessarily been "established" by "credible" testimony. And no mention is made in the stipulated findings of fact concerning the crucial issue of "apparent authority." It is only in its so-called "conclusions" that the trial court made a finding of "apparent authority," which, as above mentioned, we deem to be in reality an ultimate finding of fact. It is on this basis that we are of the view that the "clearly erroneous" rule embodied in Fed.R. Civ.P. 52 is applicable to the present case.

In this court, Constitution urges with considerable emphasis the applicability of a Colorado Court of Appeals case, Schuette v. Winternitz, 498 P.2d 1183 (Colo.App.1972), and suggests that such dictates a reversal. It is true that in that case there is broad language to the effect that a principal is not bound by the false representations of his agent made without his knowledge, consent, authority or subsequent ratification after receipt of a benefit. However, the facts of that case are quite dissimilar to the ones in the instant case. It would appear that in *Schuette* the issue of apparent authority was not raised or considered. In any event, we do not regard *Schuette* to be dispositive of the present case.

A Colorado Court of Appeals case more nearly in point is Frank v. Constitution Life Insurance Company, 519 P.2d 1206 (Colo.App.1974). Coincidentally, that case involved the same defendant as in the instant case and concerned a similar transaction where the same agent, Bryks, sold an investment certificate to one Frank, and then deposited the $5000 check made payable to Constitution in the same Cherry Creek bank account. In that case both Frank and Constitution moved for summary judgment.

Frank based his motion on the grounds that Constitution's acceptance of previous premium payments, which Frank had made by giving Bryks checks payable to Constitution, had clothed Bryks with apparent authority to accept the $5000 check for the certificate. Constitution in turn moved for summary judgment on the ground that the bank account into which Frank's checks had been deposited was in reality owned exclusively by Bryks and that no part of the $5000 had ever been actually received by Constitution. The trial court denied Constitution's motion for summary judgment, but granted Frank's motion and entered judgment for Frank against Constitution for $5000. In reversing, the Colorado Court of Appeals wrote as follows:

"An issue of fact may arise from countervailing inferences which are permissible from evidence accepted as true. O'Herron v. State Farm Mutual Automobile Insurance Co., 156 Colo. 164, 397 P.2d 227. Where undisputed evidence permits conflicting inferences, the party against whom a motion for summary judgment is made is entitled to all favorable inferences which may reasonably be drawn from the evidence; and if, when so viewed, reasonable men might reach different conclusions, the motion should be denied. O'Herron v. State Farm, *supra*. *See also* School District v. Grant, 156 Colo. 328, 399 P.2d 101.

"When the above standards are applied here, it is clear that issues of material fact remained as to Bryks' apparent authority to issue the certificate and as to the alleged negligence of plaintiffs in accepting the certificate. Therefore, plaintiffs' motion for summary judgment should have been denied."

So, in Frank v. Constitution Life Insurance Co., *supra*, the issue as to Bryks' apparent authority to sell certificates on behalf of Constitution was held to be an issue of material fact, to be resolved upon trial. Here, the issue of ap-

parent authority has been resolved upon trial and we are not inclined to disturb the trial court's disposition of the matter.

Judgment affirmed.