James **THOMAS III**, Appellant,

v.

No. 8153.

United States Court of Appeals
Tenth Circuit.

July 20, 1966.

Rehearing Denied Oct. 17, 1966.

James E. Biava, of Gray, Pfaelzer & Robertson, Los Angeles, Cal. (William G. Robertson, of Gray, Pfaelzer & Robertson, Los Angeles, Cal., and Thomas K. Loughlin, of Adams & Loughlin, Denver, Colo., with him on the brief), for appellant.

Robert Swanson, Receiver Colorado Trust Deed Funds, Inc. and Mortgage Underwriting Corporation, Denver, Colo., for appellees.

Before PICKETT, HILL and SETH, Circuit Judges.

PICKETT, Circuit Judge.

This case arose in the receivership proceeding of Colorado Trust Deed Funds, Inc. and Mortgage Underwriting Corporation, Colorado Corporations, pending in the United States District Court for the District of Colorado. It was argued along with (No. 8079) Thomas III, et al. v. Colorado Trust Deed Funds, Inc., et al., 10 Cir., 366 F.2d 136. The agreement by which Thomas acquired all the outstanding stock of Mortgage Insurance Company of America from Jayne T. Snyder of Denver, Colorado,[1] required him to assume the management of Colorado Trust Deed Funds, Inc. ("Funds"), and another Colorado corporation, Mortgage Market, Inc. ("Markets"), with power to designate corporate officers thereof.[2] The record discloses that Markets was to be liquidated. Thomas appointed C. A. McLin as manager of these corporations, and McLin undertook the responsibility for an orderly liquidation of Markets on behalf of Thomas. McLin held himself out as president of that corporation.

When Thomas took over active management of Markets, negotiations were entered into with the receiver of Los Angeles Trust Deed and Mortgage Exchange, Inc., ("L.A.T.D.") for the recovery of certain assets (notes and trust deeds) held in escrow by the receiver of L.A.T.D. for the account of Markets. Before the recovery of these assets was accomplished, McLin and Thomas induced some of the investors in Markets to accept investment certificates issued by Funds and to assign and transfer their investments from Markets to Funds.[3] When McLin obtained a release

---

1. The contract to purchase all the outstanding stock of Mortgage Insurance Company of America, which was the parent company of Colorado Trust Deed Funds, Inc., and Mortgage Underwriting Corporation, is discussed in the opinion in case No. 8079.

2. The pertinent parts of this purchase agreement provide:

   "3. James C. Thomas, III does also further agree to take over the active management of Colorado Trust Deed and Mortgage Market, Inc. and to provide for the management thereof, and to negotiate with the receiver of Los Angeles Trust Deed and Mortgage Exchange, Inc. for the delivery of deeds of trust presently held by Los Angeles Trust Deed and Mortgage Exchange, for delivery to the proper owners thereof, and otherwise administer the affairs of such corporation, and to provide for the management thereof without compensa-

   tion to Mr. Thomas, his associates, or to Mica, Colorado Trust Deed Funds, Inc. or Mortgage Underwriting Corporation.

   6. It is understood and agreed that Mr. Thomas and his associates may at this time take over the operation and management of Colorado Trust Deed and Mortgage Market, Inc., Mortgage Insurance Corporation of America, Colorado Trust Deed Funds, Inc. and Mortgage Underwriting Corporation, and may designate persons as officers and directors of these corporations, and that such persons who are presently directors of these corporations will cooperate with such endeavor and duly and regularly elect to the Board of Directors of these corporations such persons as may be designated by Mr. Thomas, * * *."

3. The assignments, after reciting that the assignor was the owner of a certain

of the notes and deeds of trust from the receiver of L.A.T.D., they were endorsed to Markets as "Trustee." They were not, however, delivered to Funds or the receiver of Funds or to the former Markets investors who had transferred their investments to Funds. Instead, McLin thereafter disposed of these assets in order to secure loans and certain real properties for Markets.

Alleging that these assets were the property of Funds by virtue of the assignments from the original owners, and that McLin, as Thomas' agent, wrongfully diverted them from Funds, the receiver of Funds instituted proceedings requesting the United States District Court to direct Thomas and McLin to show cause why they should not transfer to Funds' receivership estate those assets or pay the equivalent value thereof. After a trial, the court found McLin and Thomas liable for the wrongful diversion of these notes and deeds of trust and, upon ascertaining that such assets were not available for delivery to the receiver, entered judgment against Thomas and McLin for their value. Thomas alone appeals.

■■ For the first time it is contended upon appeal that Markets is an indispensable party to this action and that the judgment of the trial court should be vacated as it purports to affect the rights and properties of Markets. As a general rule, an indispensable party to an action is one who has such an interest in the subject matter of the litigation that a final judgment cannot be entered without affecting that interest or without leaving the controversy in such a condition that its final determination will be inconsistent with equity and good conscience. Turner v. Brookshear, 10 Cir., 271 F.2d 761; Williams v. Pacific Royalty Co., 10 Cir., 247 F.2d 672; F.R. Civ.P. 19(a). The judgment here is for the monetary value of the assets which were assigned to Funds and thereafter diverted. Even though title may have gone to Markets from L.A.T.D., they did not belong to Markets, and Funds was entitled to their possession. Markets was merely a conduit through which the property passed.

■ It is quite clear that McLin, in control of the operations of Markets, received the assets in question here. It is equally clear that the receiver of Funds was entitled to possession of them [4] for administration in the receivership estate. It is also clear that McLin wrongfully disposed of the assets, and his duty to account for their value has been determined. The dispositive question thus presented on this appeal is whether the court's finding that McLin received and thereafter diverted the assets as the

---

promissory note and trust deed issued by Markets, stated:

"WHEREAS, the second party desires to sell and assign said note and trust deed to first party and to receive as consideration for such sale and assignment trust certificates issued by first party in an amount equal to the original investment of the second party and with interest at the same rate as originally provided, * * *."

4. McLin testified:

"Q. Now, Mr. McLin, upon the execution of that agreement, you became general manager of Colorado Trust Deed Funds, Inc., that is true, is it not? A. Correct.

Q. And you also began to operate Colorado Trust Deed Mortgage Markets, Inc., did you not? A. Right.

Q. And you obtained in April of 1961 from the Receiver's for Los Angeles Trust Deed and Mortgage Exchange a great number of notes and Deeds of Trust; isn't that correct? A. That's correct."

He further testified: "Q. Well, it is true, is it not, that these investors in Colorado Trust Deed and Mortgage Markets were persuaded to accept a certificate from Colorado Trust Deed Funds, Inc.; isn't that true? A. Correct.

Q. In return for which each of them assigned to Colorado Trust Deed Funds, Inc., all the Notes and Deeds of Trust which were held in escrow by the Receiver of LATD for their benefit? A. They agreed to do this.

Q. Yes. And written agreements with them were signed. A. Correct.

Q. Along that line? A. Right."

agent of Thomas was sustained by substantial evidence. We think it was.

 Upon the execution of the original purchase contract, McLin assumed control of Markets through Thomas. Thomas directed McLin to negotiate with the receiver of L.A.T.D. in California and "do whatever could be done to recover the Trust Deeds for the investors of Markets." McLin's authority in this matter derived solely from Thomas.[5] Thomas, acting through McLin, was in the nature of a trustee for the equitable owners of the assets received from L.A.T.D., and he is not excused from liability because these assets were hypothecated or otherwise disposed of by his agent and not by himself personally. A principal is responsible for the fraudulent acts of an agent whom he has put in position to perpetrate the fraud complained of. Restatement, 2d., Agency, 261; Gleason v. Seaboard Ry., 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415; Amen v. Black, 10 Cir., 234 F.2d 12, remanded for dismissal pursuant to motion, 355 U.S. 600, 78 S.Ct. 530, 2 L.Ed.2d 523; United States v. Fox Lake State Bank, N.D.Ill. E.D., 240 F.Supp. 720; J. C. Millett Co. v. Park & Tilford Distillers Corp., N.D. Cal.S.D., 123 F.Supp. 484;

Affirmed.

---

5. Thomas testified as follows:

"Q. And it was as a result of this agreement, Exhibit 100 which has been received into evidence here, that Mr. McLin began to run Colorado Trust Deed and Mortgage Markets, Inc.? * * * A. Yes, right. * * * Q. All right. And you had Mr. McLin go out to Los Angeles and get these Trust Deeds? A. I had Mr. McLin and Mr. Littell, the attorney, go out together.

Q. Well, Mr. Andes is the one who actually got them? A. I guess he got them, but Mr. Littell took care of getting them.

Q. This was Duane Littell, the attorney? A. Right.

Q. And Mr. McLin is the one who actually got them and brought them back here? A. Well, I don't know that for sure. * * *.

Q. But my point is you never followed up to see whether or not these documents were turned over to the various investors, did you? A. Well, I don't know what you mean by 'follow up.' What would I follow up? We only had, as I understand, a few of them returned, and the ones that were returned stayed with the company, and there was nothing to do with it.

Q. Well, you were aware, of course, per Exhibit No. 3 that was admitted into evidence at one of our earlier hearings, there were a total of—now, without adding them up, there appears to be far more than 100 or 150? A. Well, I never saw them, but I assume they were all made out to the individual people's names, and that the only person they would be good for would be the people they were paid out to.

Q. But you never followed up to see what was being done with them after McLin got them? A. I had an attorney, Mr. Littell; that was his job.

Q. My question, sir, is if you followed up, personally? A. The only way I followed up personally was through what I was told and through Mr. Littell, which I told to get them, and also to see that they were taken care of, or whatever had to be done.

Q. Did you ask Mr. McLin what he had done with them? A. Well, as far as I knew and as far as I was told, they were given back to the people."