Harold G. WHITEIS, a sole proprietor,
d/b/a Motor Sports of Tulsa,
Plaintiff-Appellee,

v.

YAMAHA INTERNATIONAL CORPO-
RATION, a corporation,
Defendant-Appellant.

Harold G. WHITEIS, a sole proprietor,
d/b/a Motor Sports of Tulsa,
Cross-Appellant,

v.

YAMAHA INTERNATIONAL CORPO-
RATION, a corporation,
Cross-Appellee.

Nos. 75–1036 and 75–1037.

United States Court of Appeals,
Tenth Circuit.

Argued Sept. 16, 1975.

Decided March 9, 1976.

Rehearing Denied in No. 75–1036
April 12, 1976.

Joseph A. Sharp, Tulsa, Okl. (Joseph F. Glass, Tulsa, Okl., on the brief), for defendant-appellant and cross-appellee.

Murray Cohen, Oklahoma City, Okl., for plaintiff-appellee and cross-appellant.

Before HILL, SETH and DOYLE, Circuit Judges.

HILL, Circuit Judge.

This action was commenced by appellee, Harold G. Whiteis, to recover damages resulting from the cancellation of his franchises to sell Yamaha motorcycles. After a trial to the court, judgment was entered against appellant, Yamaha International Corporation, in the amount of $100,000. The trial court found Yamaha acted in bad faith in violation of its obligations under the franchise contracts and under Okl.Stat. Ann. tit. 47, § 561 et seq. (Supp.1975–76).[1]

Yamaha has appealed the judgment against it and Whiteis has cross-appealed from the denial of attorney's fees and punitive damages. We affirm on all issues except attorney's fees.

In 1962 Whiteis was granted an exclusive franchise to sell Yamaha motorcycles in Tulsa County, Oklahoma. The franchise agreement was oral and was the only agreement between the parties until 1964. There is evidence that in 1964 Yamaha changed its policy of granting exclusive territorial franchises to a policy of granting only dealership site franchises. Early that year Yamaha mailed Whiteis a written franchise agreement. Because the proposed agreement said nothing about his exclusive franchise area, Whiteis refused to sign. Some weeks later, at a national sales conference, Whiteis met with Yamaha's regional and national sales managers. The national sales manager told Whiteis the only purpose of the written agreement was to satisfy the requirements of Oklahoma law for the authorization of motor vehicle dealers and in no way affected their prior oral agreement for an exclusive franchise. The confrontation was repeated in 1965 when Whiteis again refused to sign a written franchise agreement without further assurance he still had the exclusive franchise. This time a new national sales manager made the same representation to Whiteis.

In subsequent years Whiteis signed written agreements without question. By 1969, the date of the last written agreements, there were written franchise agreements in effect for four separate dealership locations. Each stated that no exclusive territory was assigned to Whiteis, and each stated it superseded all prior agreements and

---

1. Section 565(j)(4) provides that a manufacturer's or distributor's license may be revoked if it "has cancelled or failed to renew the franchise agreement of any motor vehicle dealer . . . unfairly and without just provocation or without due regard to the equities of the dealer or without good faith, as defined herein." The section further provides that upon such cancellation, the party cancelling "shall compensate the dealer for his damages including attorney's fees . . . .."

Section 569 provides that it shall be a violation of the act and against the public interest for a manufacturer or distributor of motor vehicles "in terminating, cancelling or failing to renew a franchise, to fail to act in good faith and in a fair, equitable and nondiscriminatory manner." This section also provides that the burden of proving good faith shall be on the manufacturer.

Section 576 provides the venue in damages actions under the act.

was the only agreement between the parties. The agreements provided for cancellation by either party without cause upon giving 30 days written notice.

During the period from 1963 through 1970 Whiteis' business grew and prospered in varying degrees. He won several awards and sales contest trips for outstanding performance as a dealer. His operation peaked in 1970 with gross sales exceeding $400,000 and net profits over $45,000.

In 1971 Yamaha undertook a deliberate campaign to get rid of Whiteis as a dealer. This effort was allegedly prompted by a letter of complaint against Whiteis received by Yamaha from 18 former Whiteis customers. The trial court found there was "no evidence, whatsoever, that it was a genuine, authentic letter of complaint." There was evidence indicating it was phony. Yamaha did not investigate the supposed complaint, but directed its district sales manager, Larry Murphy, to document any and all possible reasons to terminate Whiteis. Murphy compiled his reasons and sent them to Yamaha with requests for cancellations. Yamaha then cancelled the franchises for three of Whiteis' four dealership locations. The trial court found the reasons submitted by Murphy were not the true reasons he requested the cancellations; he requested them because he was directed to do so by Yamaha's national sales manager. Murphy testified he did not know why Yamaha wanted to get rid of Whiteis unless it was because he had an exclusive franchise. At about this time Yamaha did franchise another dealer in Tulsa. This dealer received extensive financial support for racing, an important means of motorcycle advertising, and was able to get popular models for sale which were unavailable to Whiteis.

At trial Whiteis relied heavily on a breach of the oral agreement for an exclusive franchise as a basis for recovery. Much of Yamaha's argument on appeal is directed to the oral agreement. Yamaha argues it is either unenforceable because of the statute of frauds or is superseded and extinguished by the subsequent written agreements which provided for termination at any time without cause. These arguments, however, do not go to the legal basis of the trial court's judgment. The trial court held the oral agreement was not within the statute of frauds, but held it made no difference to the outcome of the case whether or not it was abrogated by the written agreements. Even under the theory most favorable to Yamaha, there were valid written contracts granting the franchises. The judgment was based on the wrongful cancellation of these franchises, not on a breach of the exclusive franchise agreement. Therefore, we need not discuss the issues relating to the validity of the oral contract for an exclusive franchise.

■ The trial court found Yamaha violated the good faith obligation implied in the contracts and the good faith requirements specifically imposed on motor vehicle manufacturers and distributors by Okl.Stat. Ann. tit. 47, § 561 *et seq.* (Supp.1975–76), in cancelling, terminating or failing to renew a franchise. We are doubtful whether the trial court's judgment could be sustained on contractual good faith grounds, but are convinced it may be upheld on statutory grounds. It has been the general rule that courts would not inquire into the reasons for termination when the contract reserved the power to terminate without cause, and Oklahoma courts have apparently followed this rule. *Ford Motorcar Co. v. Rackley,* 65 Okl. 288, 166 P. 427 (1917). *See also Ritter v. Perma-Stone Co.,* 325 P.2d 442 (Okl.1958); *Adalex Laboratories v. Krawitz,* 270 P.2d 346 (Okl.1954).

The shortcomings of the general rule were felt most keenly in cases involving arbitrary termination of dealer's franchises. Through a manufacturer's caprice, a dealer could be denied the opportunity to reap the profits from a substantial initial investment.[2] Because of the difficulties in applying the concept of contractual good faith to

---

2. For a discussion of the problem and judicial efforts to fashion a remedy for injured dealers, see 6 Corbin on Contracts § 1266 (1962).

contracts terminable without cause, statutes have been enacted to protect motor vehicle dealers.[3] One such enactment is Okl.Stat.Ann. tit. 47, § 561 et seq. The Oklahoma statutes impose a duty of good faith on manufacturers and distributors in cancelling, terminating or failing to renew a franchise and provide that the dealer shall be compensated for any damages sustained from a wrongful termination. The evidence of bad faith is abundant in this case, and the Oklahoma Statutes entitle Whiteis to recover damages from Yamaha.

Yamaha contends the evidence failed to establish a basis for the award of damages. In support of its contention Yamaha points out that of the three dealerships for which the franchises were cancelled, none was an operative business at the time. While this may be technically true, it does not reflect the substance of Whiteis' dealings with Yamaha or the true status of his business before the cancellations.

Whiteis' first dealership, opened in late 1962 or early 1963, was known as Tulsa Cycle Sports, 1701 Charles Page Boulevard. It was closed in 1971 when a major construction project closed the street. Whiteis owned the building and planned to reopen it when the street was finished. Some parts, counters and equipment were left in the building at the time of trial. Whiteis notified the Oklahoma Motor Vehicle Commission that he did not intend to renew his dealer's license in 1972, stating the franchise had been terminated in November, 1971.

Pappy's Cycle Center was opened by Whiteis in 1967 at 9204 East Avenue. It operated there for about one year. The 1969 franchise agreement designated the location as 30 South Union Street which was Whiteis' home. In 1971 Whiteis had taken a five-year lease on a building at 4804 East Eleventh Street intending to open it as Pappy's Cycle Center. He had set up the store and had motorcycles on display when

Larry Murphy, Yamaha's district manager, paid him a visit. Murphy informed Whiteis that Yamaha would not allow him to sell motorcycles at that location and he had better get the cycles out of there. Whiteis had never held a dealer's license under the name "Pappy's."

Whiteis' largest dealership was Yamaha of Tulsa, opened in 1965 at 2623 East Eleventh. He lost this location in 1971 because his landlord elected to tear down the building and put up a shopping center. Having lost this lease, Whiteis leased new premises at 6912 East Admiral. He prepared for business as he had with the new Pappy's Cycle Center, but encountered similar resistance from Yamaha. Whiteis signed and sent the usual specific site franchise agreement to Yamaha on October 21, 1971, but Yamaha refused to sign it. Five days later Yamaha cancelled all three franchises. In 1972 Whiteis transferred his dealer's license from Yamaha of Tulsa to his Motor Sports of Tulsa dealership. The franchise for Motor Sports was cancelled after this litigation commenced and is not directly involved in the damages sought here.

Yamaha argues that under these facts none of the disenfranchised dealerships was an established business. It cites the rule disallowing recovery of profits when the injured business is not established and provides no basis for predicting future profitability. E. g., Plastic Products Corp. v. Filtrol Corp., 137 F.Supp. 401 (N.D.Okl. 1955); Dieffenbach v. McIntyre, 208 Okl. 163, 254 P.2d 346 (1952). We cannot agree with Yamaha's characterization of the evidence. With the exception of the Pappy's dealership, Whiteis' businesses were established and profitable. They were closed only temporarily and Whiteis had the intention and the ability to reopen them.

The evidence supports a finding that Yamaha's conduct was responsible for the permanent demise of both Tulsa Cycle Sport and Yamaha of Tulsa. Both had a

---

**3.** The first act of this type was known as "The Automobile Dealers' Day-in-Court Act," 15 U.S.C. § 1221 et seq. This Act gives a dealer a cause of action in federal court when an auto-

mobile manufacturer fails to act in good faith in terminating, cancelling or not renewing the dealer's franchise.

sufficient history of profitability to support an award of damages. We do not believe error can be predicated on the fact Pappy's was not a going concern. Whiteis had not operated a dealership under this name since 1967 and no profits from it would be reflected in Whiteis' income for the years relevant to determining his lost profits.

Yamaha also argues that because Whiteis kept only one set of books for all his dealerships, it is impossible to ascertain the loss of profits attributable specifically to the three cancelled franchises. This argument raises questions both as to the existence and as to the amount of damages. There is a distinction to be made between the two in the application of the "reasonable certainty" standard for proof of damages. *Ash v. Charles F. Noble Oil & Gas Co.*, 96 Okl. 211, 223 P. 175 (1923); 22 Am.Jur.2d *Damages* § 171 (1965); 5 Corbin on Contracts § 1020 (1964). In the *Ash* case the Oklahoma Supreme Court stated:

> [T]he great weight of modern authority appears to hold that the rule that damages which are uncertain or contingent cannot be recovered . . ., does not apply as to the uncertainty of the amount, but only to uncertainty as to whether any damage or benefit has resulted in the breach of the contract involved. (223 P. at 178).

The effect of the distinction has been stated in other cases:

> It being apparent that some loss was suffered, it is then entirely proper to let the jury determine what the loss probably was from the best evidence the nature of the case affords.

*Bishop-Babcock-Becker Co. v. Estes Drug Co.*, 63 Okl. 117, 163 P. 276, 278 (1917); accord, *Southwest Ice & Dairy Products Co. v. Faulkenberry,* 203 Okl. 279, 220 P.2d 257 (1950); *Johnson Oil Refining Co. v. Elledge,* 175 Okl. 496, 53 P.2d 543 (1936).

■ We think it is apparent Whiteis suffered a loss of profits. He had been in business eight years and had no major debts. He had started with Yamaha when the motorcycle business, as we know it today, was still in its infancy and Yamaha was still relatively unknown in this country. With the exception of the years 1967 and 1968, he had consistently shown a profit. The decrease in profits concurred in time with the franchise cancellations and continued thereafter. In addition, there was expert testimony that the cancellations were the cause of Whiteis' loss of profits. We conclude it was entirely proper for the trial court to find the amount of damages based on the evidence of Whiteis' income in relevant years, even though his accounting methods did not segregate income from different franchise locations. We will not overturn the trial court's judgment as to the amount unless it is clearly erroneous.[4]

The evidence provided by two certified public accountants discloses the following income statistics in recent years.

| Year | Whiteis' Accountant (cash basis) | Yamaha's Accountant (accrual basis) |
|---|---|---|
| 1968 | − $ 7,455 | − $27,000 |
| 1969 | + $ 8,470 | + $44,929 |
| 1970 | + $46,850 · | + $45,111 |
| 1971 | − $35,415 | + $20,613 |
| 1972 | + $14,000 | − $24,000 |

There also is evidence the trend continued into 1973 when Whiteis made little or no profit. A third certified public accountant testified these figures indicated a profitable business with consistently increasing gross sales and an average annual profit around 10 percent of gross sales. The witness concluded that these profits should have continued into the foreseeable future.

We cannot say the trial court's finding of $100,000 as the amount of damages is clearly erroneous. Based on the accrual basis accounting of Yamaha's witness, Whiteis lost three-fourths of that amount in 1972 alone. Although we agree with Yamaha that part of the lost profits in 1971 may be attributed to temporary closings for other reasons, Yamaha's bad faith cancellations are the dominant causal factor in the subsequent years' losses. Had it not been for Yamaha's action, the franchise agreements could have continued in effect indefinitely.

4. F.R.Civ.P. 52(a).

A primary purpose of the principles applied to proof of amount of damages is to avoid excessive verdicts based on sympathy rather than reasonable inferences. 22 Am. Jur.2d *Damages* § 172 (1965); 5 Corbin on Contracts § 1022 (1964). The damages awarded by the trial court are based on reasonable inferences, even though they were not subject to computation with mathematical certainty.

We turn now to the issues raised by Whiteis on cross-appeal. We affirm the trial court's denial of punitive damages. The arguments in the briefs concern whether this case is within the general rule that punitive damages are not recoverable in breach of contract actions, *e. g., Colby v. Daniels,* 125 Okl. 202, 257 P. 298 (1927), or the rule allowing recovery of punitive damages when the breach of contract is tortious in nature. *Hall Jones Oil Corp. v. Claro,* 459 P.2d 858 (Okl.1969). We do not rest our decision on either rule. The trial court did not hold, as a matter of law, that punitive damages could not be recovered. Rather, the court denied them because, under the evidence introduced at trial, it did not believe a punitive award "would serve any purpose." Punitive damages are not recoverable as a matter of right and whether or not they are recoverable is within the discretion of the court as the trier of the facts. 25 C.J.S. *Damages* § 117(2) (1966); 22 Am. Jur.2d *Damages* § 240 (1965). We will not contravene the trial court's discretion and force it to award punitive damages.

The final issue for our consideration is whether the trial court erred in not awarding attorney's fees to Whiteis. The Oklahoma act regulating motor vehicle manufacturers and distributors contains a provision for awarding attorney's fees. The trial court held it applies only to proceedings before the Oklahoma Motor Vehicle Commission, and this position is supported by Yamaha on appeal. Whiteis argues the statute authorizes the awarding of attorney's fees in private damage actions.

The statute in question, Okl.Stat.Ann. tit. 47, § 565(j)(4), provides that a manufactur-

er's or distributor's license may be revoked if it:

Has attempted to or has cancelled or failed to renew the franchise agreement of any motor vehicle dealer in this state unfairly and without just provocation or without due regard to the equities of the dealer or without good faith, as defined herein.

The next sentence states:

Upon such cancellation or failure to renew a franchise agreement, the party cancelling or failing to renew the franchise agreement shall compensate the dealer for his damages including attorney's fees as aforesaid, resulting from the cancellation or failure to renew the franchise agreement.

The confusion arises from the inclusion of a provision for a civil damage action in a statute pertaining primarily to grounds for suspension or revocation of licenses by the Oklahoma Motor Vehicle Commission. However, we think this is clearly what the Oklahoma legislature has done. In *Groom v. Kawasaki Motors Corp.,* 344 F.Supp. 1000 (W.D.Okl.1972), section 565(j)(4) apparently was interpreted as creating both a proceeding for license revocation and a civil action for damages. This is the only reasonable construction of the statute.

As a rule of statutory construction, there is a presumption that every provision of a statute is intended to serve a purpose and should be given effect. *Hunt v. Washington Fire & Marine Ins. Co.,* 381 P.2d 844 (Okl.1963). The legislature is never presumed to have done a vain thing. *Moral Insurance Co. v. Cooksey,* 285 P.2d 223 (Okl. 1955). Were we to agree with Yamaha's construction of the statute—that it applies only to proceedings before the Motor Vehicle Commission—the provision for damages and attorney's fees would be left without effect. The Motor Vehicle Commission does not entertain actions for damages.

In addition, section 565(j)(4) was amended to include the provision for damages and attorney's fees at the same time section 572, providing for venue in damage actions, was

added to the act.[5]  Before these 1970 amendments, the act did not specifically authorize private damage actions for franchise terminations which violated the terms of the act.  This indicates the 1970 amendment to section 565(j)(4) was part of an overall plan to assure adequate compensation for dealers whose franchises are wrongfully terminated.

We conclude that the statute applies to this case.  Its plain terms authorize compensation for the dealer's damages "including attorney's fees."  The trial court's holding that it could not award attorney's fees was erroneous.  We affirm the judgment in all other respects, but remand for a determination of reasonable fees for Whiteis' attorneys.

---

5.  Ch. 197, [1970] Okl.Sess.Laws 326–34.