Frankie J. KING and Beverly J. King,
Plaintiffs-Appellees and
Cross-Appellants,

v.

HORIZON CORPORATION, Defendant-
Appellant and Cross-Appellee.

Nos. 80–1717, 80–1752.

United States Court of Appeals,
Tenth Circuit.

March 10, 1983.

Rehearing Denied June 6, 1983.

Robert J. Kapelke, Denver, Colo. (Stephen Klein, Denver, Colo., on briefs), Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for defendant-appellant and cross-appellee.

Kenneth N. Kripke, Denver, Colo. (Joseph M. Epstein, Denver, Colo., on brief), Kripke & Epstein, P.C., Denver, Colo., for plaintiffs-appellees and cross-appellants.

Before SETH and DOYLE, Circuit Judges, and ANDERSON, District Judge.*

ALDON J. ANDERSON, District Judge.

Appellant, Horizon Corporation [Horizon], is a Delaware corporation with its principal office and place of business in Tucson, Arizona. It has been acquiring, subdividing and reselling undeveloped lots in New Mexico, Texas, and Arizona. Generally, Horizon's pattern of sales has been to sell vacant unimproved land, sometimes without examination, for investment purposes, and then to induce the buyers to "trade up" their land to other lots after making site visits. This process of selling land to prior customers is sometimes referred to as "reloading."

Cross-appellants, Frankie J. King and Beverly J. King [Kings], unsophisticated real estate purchasers, first began investing in the Horizon developments in 1973. In the next few years the Kings were induced to trade in their old single-family lots toward the purchase of more expensive lots in the Horizon development located at Waterwood, Texas. This process of "trading up" occurred nine times before the transaction occurred that is the subject of this action.

In September of 1975 the Kings were once again persuaded to trade in their other Horizon property and to invest additional cash to purchase a multi-family lot in Waterwood, Texas. The new lot sold for $75,700, less a trade-in credit of $19,900. In order to induce the Kings to purchase this property, Horizon's sales representative, a Mr. Carl Gustafson, told them that the lot had a *present* value of $75,700 and was a good investment. This representation was false and was known by Mr. Gustafson to be false at the time it was made.

At the time of the above-noted sale, the Kings were supplied a number of documents that they were supposed to read before signing the relevant land sales contract. These documents contained various disclaimers as to Horizon's responsibility for the representations of its agents. For example, the Agreement for Deed that the Kings executed stated that "[b]uyer acknowledges that he has relied solely upon the representations contained herein ... that no guarantee of appreciation, resale or repurchase has been given." The Kings signed the agreement without having read it and without having read any of the documents they were given. The Kings claimed that the reason they did not read the documents was the fact that Horizon delivered them after they had been "wined and dined" and with no serious effort on the part of Horizon to inform them of the significance of the documents.

When the Kings discovered that the land they had purchased was only worth $8,300 they brought an action for deceit against Horizon in the United States District Court for the District of Colorado. Jurisdiction existed by virtue of diversity of citizenship. 28 U.S.C. § 1332.

One year after the action was commenced in the trial court, Judge Ernest G. Barnes, Administrative Law Judge, rendered an Initial Decision (Docket No. 9017) in a Federal Trade Commission [FTC] proceeding entitled, "In the Matter of Horizon Corporation." [FTC Report.] The FTC action was commenced in March of 1975 with a 36 count complaint charging Horizon with unfair or deceptive acts and practices and unfair methods of competition. Over 200

---

* Honorable Aldon J. Anderson, Chief Judge, United States District Court for the District of Utah, sitting by designation.

witnesses and more than 2400 exhibits were heard and examined over an eighteen-month period from March, 1977 through September, 1978. After hearing this evidence Judge Barnes found that Horizon had engaged in a pattern and course of fraudulent and deceptive conduct. The Kings filed a Motion in Limine with the trial court seeking to have the FTC findings admitted into evidence under Rule 803(8)(c), Federal Rules of Evidence. The trial court in May of 1980 ruled that the findings were admissible under the Rule but limited their admissibility to that of "background material."

The action was tried to the trial court and on May 30, 1980, it entered its findings, conclusions, and judgment in the matter. The court ruled that Horizon's agent, Mr. Gustafson, had made a fraudulent statement that had induced the Kings to purchase the subject property; that the fraud could be attributed to Horizon; and that Horizon was liable to the Kings for what they were "out of pocket" from the deal, including the "trade in" value of their prior Horizon properties, less what the land was worth. The court did not feel that the Kings were entitled to punitive damages, however. Both sides have appealed from the judgment.

Horizon alleges that the trial court erred as a matter of law in finding that the Kings reasonably relied on its agent's misrepresentations, when the documents of sale expressly disclaimed any authority in its agents to make such representations. Horizon also alleges that the trial court erred in its calculation of the compensatory damage award since the court included the full so-called value of the land that the Kings had traded in toward the purchase price of the new acquisition.

The Kings' appeal from the trial court's judgment is based on their assertion that the court erred in limiting the admissibility of the FTC Report to background material. If the court had not limited the admissibility of the report, it is the Kings' allegation that a finding of punitive damages would have been appropriate.

■ Since the trial court below was the trier of fact, its findings of fact should not be disturbed on appeal unless clearly erroneous. Fed.R.Civ.P. 52(a); *see, e.g., Guzman v. Pichirilo,* 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962). In addition, since the action was one based on diversity "[d]eference is to be accorded the views of a resident federal district judge with respect to the interpretation and application of the law of his state ... [and] [a]ppellate review is ... governed by the 'clearly erroneous' standard." *Loveridge v. Dreagoux,* 678 F.2d 870, 877 (10th Cir.1982). *See also Audit Services, Inc. v. Rolfson,* 641 F.2d 757 (9th Cir.1981); *Great-West Life Assur. Co. v. Levy,* 382 F.2d 357 (10th Cir.1967).

Applying the foregoing standards of appellate review, the court is persuaded that the trial court did not err in either its findings of fact or in its conclusions of law. Specifically, the court is of the opinion, for the reasons more fully set forth below, that the trial court was correct in ruling that the admissibility of the FTC Report should be limited, that the Kings were not entitled to punitive damages, that the Kings could have reasonably relied upon the misrepresentations of Horizon's agent in the face of Horizon's disclaimer clauses, and that there was a reasonable basis for adding the full value of the traded-in property in the assessment of damages.

## A. The FTC Report

■ The Kings allege that the trial court erred in limiting the admissibility of the FTC Report to "background material." In support of their allegation the Kings argue that under the circumstances surrounding the FTC hearing (Horizon, represented by counsel, was present throughout the hearing, was given ample opportunity to cross-examine witnesses, and presented in excess of 100 witnesses in its own behalf) "[t]here cannot be any real question of trustworthiness of the findings of fact." Opening/Reply Brief of Plaintiff-Appellees and Cross-Appellants at 26. The Kings argue that "untrustworthiness" is the only basis for denying the admissibility of an "investiga-

tive report" under Rule 803(8)(c).[1] The Kings further note that no court, which has admitted an exhibit under the rule, has limited the admission of an investigative report to "background material."

■ This court is not persuaded by the arguments presented. Once an exhibit has been admitted into evidence, and no one disputes that the trial court admitted the FTC Report, the "weight" to be given it is within the discretion of the trial court. As noted by the United States Supreme Court, regarding the effect of an arbitration decision on a subsequent suit in federal district court: "The arbitral decision may be admitted as evidence and *accorded such weight as the court deems appropriate.*" *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 60, 94 S.Ct. 1011, 1025, 39 L.Ed.2d 147 (1974) (emphasis added). Further, the Court refused to set up standards to be applied in determining the weight to be accorded the exhibit since "this must be determined in the court's discretion with regard to the facts and circumstances of each case." *Id.* at 60 n. 21, 94 S.Ct. at 1025 n. 21. See also *United States v. School District of Ferndale,* 577 F.2d 1339, 1355 (6th Cir.1978).

In regard to the FTC Report, the trial court expressed its fears that the findings might contain errors, since it had not yet been affirmed by the full commission and had not yet been subject to judicial review. Tr. (Supp. Vol. I) at 12. The report was, accordingly, limited to background material and this court will not say that the trial court abused its discretion in doing so.

### B. Punitive/Exemplary Damages

The Kings allege that if the trial court had not erred in limiting the admissibility of the FTC Report it would have been convinced beyond a reasonable doubt that they were entitled to punitive damages.[2] They argue that the report demonstrates that Horizon intentionally engaged in a nationwide scheme of fraudulent sales practices and that such intentional fraudulent behavior justifies an award of punitive damages.

■ Inasmuch as this court has concluded that the trial court did not err in limiting the admissibility of the FTC Report, the Kings' arguments in favor of an award of punitive damages are not compelling. Further, even if the trial court had fully admitted the FTC Report, its decision against awarding punitive damages would still be upheld. The law of Colorado allows, but does not compel, an award of punitive damages under certain circumstances. Section 13-21-102, Colorado Revised Statutes (1973), states:

> In all civil actions in which damages are assessed by a jury for a wrong done to the person, . . . and the injury complained of is attended by circumstances of fraud, . . . the jury, in addition to the actual damages sustained by such party, *may* award him reasonable exemplary damages.

(Emphasis added).

This court has stated that a litigant has no right to an award of punitive damages, unless awarded by statute, and "that whether or not such damages are recoverable rests always in the discretion of the jury, or in the discretion of the court sitting as a jury." *Stoody Co. v. Royer,* 374 F.2d 672, 680 (10th Cir.1967). No Colorado statute awards punitive damages as a matter of right. The trial court, sitting as the trier of the facts, ruled that an award of such damages was not appropriate under the circumstances of this action. Accordingly, "[w]e

---

1. Rule 803(8)(c) states in pertinent part:

 (8) *Public records and reports.* Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . (C) in civil actions and proceedings and against the government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

2. The Kings, under Section 13-25-127, Colorado Revised Statutes (1973), had the burden in the trial court to prove their entitlement to exemplary damages beyond a reasonable doubt, rather than by a preponderance of the evidence.

will not contravene the trial court's discretion and force it to award punitive damages." *Whiteis v. Yamaha International Corp.,* 531 F.2d 968, 973 (10th Cir.1976), *cert. denied,* 429 U.S. 858, 97 S.Ct. 157, 50 L.Ed.2d 135.

## C. Horizon's Liability

Having disposed of the Kings' cross-appeal, it now becomes necessary to address the appeal of Horizon. Horizon submits that the trial court erred as a matter of law in finding that the Kings proved the element of "reasonable reliance," an element essential to the establishment of liability for common law fraud under Colorado law.[3]

The Agreement for Deed, executed by the Kings, contained a standard clause to the effect that "[b]uyer acknowledges that he has relied solely upon the representations contained herein...." Horizon argues from this clause, and the other disclaimer clauses contained in the additional documents given to the Kings at the time of execution, that:

> Where there is a written contract entered into between a seller and a purchaser, which disclaims any and all oral representations made by the agent of the seller, the buyer cannot maintain an action for fraud against the seller based upon misrepresentations of the agent.... Under such circumstances, there is no right to rely on representations made by the agent. In other words, any reliance on the part of the purchaser is unreasonable. The purchaser must bear the consequences of his own negligence in failing to heed the warnings set forth in the written contract.

Opening Brief of Defendant-Appellant at 6 (citations omitted).

In short, Horizon argues that under the legal proposition that a purchaser should read his contract before signing the same, the Kings are precluded, as a matter of law, from bringing an action in deceit or misrepresentation.

■ The trial court was well aware of Horizon's argument and the underlying basis of that argument. Prior to giving its findings the court noted:

> This is not an easy case of fraud. This is a very difficult case, because almost from the beginning of this country, we've had the principle of "Let the buyer beware...."
>
> ....
>
> The law says, "Let people really understand what they're buying. You're responsible for your own signature and for your own contract."

Tr. (Court's Findings, Conclusions, and Judgment) at 2–3. Nonetheless, reasoning that "[t]here has been some change in philosophy ... over the years," *id.* at 3, the trial court ruled that Horizon was liable for the fraudulent misrepresentations of its agent, and that the Kings could reasonably rely upon the agent's representations. This court agrees.

Horizon is correct in asserting that as a general principle of law a purchaser cannot rely on the oral representations of an agent of the seller where the seller has included a written disclaimer in the contract that the purchaser has negligently failed to read. Purchasers ought to read their contracts! Horizon is mistaken, however, if it believes that the general principle is without exception.

Professor Williston, in his treatise on contracts, notes that a merger clause, designed to limit the apparent authority of an agent

---

**3.** The Colorado Supreme Court outlined in *Zimmerman v. Loose,* 162 Colo. 80, 425 P.2d 803, 807 (1967) the elements required to establish fraud.

> First, however, we should briefly discuss the legal elements which must be shown to be present in order to establish fraud. Admittedly, there must be shown to be a representation or lack of information coupled with a duty to inform. These representations or lack of them must go to material facts and must be shown to be false or misleading. The party making them must have known they were false or be indifferent to their truth or falsity. Then, the party claiming the fraud must have relied upon the representations, have had a right to rely on them, have acted in accordance with the reliance and in doing so have been damaged.

and to preclude a defense of fraud, is ineffective to stop an equitable action for rescission "even if the principal is himself innocent [since] he cannot be allowed to retain a benefit obtained by the fraud of his agent." 5 Williston on Contracts, § 811, pp. 889–90 (3d ed. 1961). Further, if the purchaser wants to affirm the contract, he may do so and bring an action for damages in "deceit" against the agent and principal; *Neiheisel v. Malone,* 150 Colo. 586, 375 P.2d 197 (1962). If the fraud can be attributed to the principal then a written disclaimer (merger) clause will not save him from liability. 5 Williston at 890. As noted in the classic case of *Angerosa v. White Co.,* 248 App.Div. 425, 290 N.Y.S. 204 (1936):

> To deny relief to the victim of a deliberate fraud because of his own negligence would encourage falsehood and dishonesty. . . .
>
> . . . .
>
> In this jurisdiction protection is given to one who is injured by falsehood or deception; fraud vitiates everything which it touches, and destroys the very thing which it was devised to support; the law does not temporize with trickery or duplicity.

*Id.* 290 N.Y.S. at 211, 213.

The rationale for the exception of allowing an action in deceit against a principal, to whom fraud is attributable, is the same as that stated in the 1941 opinion of *Bates v. Southgate,* 308 Mass. 170, 31 N.E.2d 551, 558:

> As a matter of principle it is necessary to weigh the advantages of certainty in contractual relations against the harm and injustice that result from fraud. In obedience to the demands of a larger public policy the law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it. No one advocates a return to outworn conceptions. The same public policy that in general sanctions the avoidance of a promise obtained by deceit strikes down all attempts to circumvent that policy by means of contractual devices. In the realm of fact it is entirely possible for a party knowingly to agree that no representations have been made to him, while at the same time believing and relying upon representations which in fact have been made and in fact are false but for which he would not have made the agreement. To deny this possibility is to ignore the frequent instances in everyday experience where parties accept, often without critical examination, and act upon agreements containing somewhere within their four corners exculpatory clauses in one form or another, but where they do so, nevertheless, in reliance upon the honesty of supposed friends, the plausible and disarming statements of salesmen, or the customary course of business. To refuse relief would result in opening the door to a multitude of frauds and in thwarting the general policy of the law.

If evidence exists in the record, therefore, that would support a finding that the fraudulent misrepresentation of Mr. Gustafson, that the land had a value of $75,700, is attributable to Horizon, then the existence of the disclaimer clauses will not preclude, as a matter of law, a finding of reasonable reliance, and the trial court's finding of such will be upheld.

 The fraud of an agent may be attributed to the principal in a number of ways. First, it is clear that where the principal knows of and encourages the fraudulent behavior of his agent he is going to be liable for that fraudulent behavior himself and cannot avoid that liability through the use of a disclaimer clause. Second, if the principal accepts the fruits of the fraud, with knowledge of the misrepresentations by which the fraud was accomplished, he has ratified the fraudulent act and will be liable for it. Third, as this court stated in *Gilmore v. Constitution Life Insurance Co.,* 502 F.2d 1344 (10th Cir.1974) (applying Colorado law) a principal may be liable for the fraud of his agent where he exercises an inadequate amount of supervision over that agent. That is,

> a principal may not turn loose his agent on the general public, and then merely sit

back and exercise little or no supervision. In this regard, *see,* for example, *Witcher v. Gibson,* 15 Colo.App. 163, 61 P. 192 (1900), where appears the following:

'... It is always incumbent on ... [a principal] to conduct his business with care. He is not bound to be constantly on the lookout to see that he is not cheated. But he is certainly obligated to keep himself advised of the course of his business, and to know whether his agent is using the specific authority which is granted him, and, if he is not, to advise the parties with whom he is dealing to no longer transact such business with him....'

*Id.* at 1348–49. See also *Thomas v. Colorado Trust Deed Funds, Inc.,* 366 F.2d 140 (10th Cir.1966).

Upon review of the record there is ample evidence to support the trial court's finding that the fraud of Mr. Gustafson may be attributed to Horizon. The FTC Report[4], which was admitted into evidence, though limited in weight, indicates that by 1974 Horizon was aware of the fact that its agents, including Mr. Gustafson, operating out of Denver, Colorado, were engaging in misrepresentation. Tr. Ex. P–35 at 177. This fact was once again brought to its attention in August of 1975 when it conducted an internal survey of the Denver office. *Id.* at 179–80. In spite of this knowledge Horizon failed to put a stop to the misrepresentations and continued to accept the sales procured by the defrauding agents. By virtue of Horizon's lack of action the trial court could have reasonably determined, under the specific facts of the King transaction that took place one month after the 1975 survey, that Horizon either ratified a sale that it knew was procured by fraud or had engaged in such inadequate

supervision that it ought to have reasonably anticipated the further fraud of its agent and taken supervisory steps to avoid it.

Under the exception that a disclaimer clause does not preclude an award in damages against a principal to whom a fraud is attributable, it would appear that the trial court's ruling ought to be upheld. Horizon argues, however, that the State of Colorado does not favor the exception to the general principle that "[t]he purchaser must bear the consequences of his own negligence in failing to heed the warnings set forth in the written contract." Opening Brief of Defendant-Appellant at 6. This court disagrees.

Horizon relies extensively on the case of *Canon City Industrial Stores Co. v. McInerney,* 71 Colo. 492, 208 P. 457 (1922), for its proposition that the trial court erred in its determination. The difficulty with Horizon's reliance on *Canon City* is that it is distinguishable from the present action. First *Canon City* did not address a fact situation where the fraud of an agent could be attributed to the principal. The Colorado Supreme Court has indicated that the general principle does not apply where the principal has knowledge of the fraudulent representations of the agent. *See Trujillo v. Wichita Farm Lighting Co.,* 91 Colo. 307, 14 P.2d 1009 (1932). Second, the disclaimer clauses in this action do not specifically address the type of misrepresentation that was made. Unlike *Canon City,* where the disputed clause stated that "no agent ... has authority *to in any manner* change, add to, or detract from the [contract]" (emphasis added), this action involves clauses that appear to only limit the agent's authority to make representations as to the *future* value of the land being purchased. For example,

4. The trial court is unclear in its findings, conclusions and judgment on what bases it was relying to attribute the fraud of Mr. Gustafson to Horizon. Under the principles of appellate review that the lower court's findings will be upheld if there is any support in the record, this court has undertaken to examine all of the evidence admitted, including the FTC Report. Since the FTC Report is the strongest evidence supporting the trial court's finding, it is this court's decision that it is appropriate to rely

upon the report to demonstrate why the trial court's finding is supported by the record. It is not the intent of this court, however, that this reliance should be interpreted in any way as expressing an opinion on how much "weight" the report received in the court below. As noted in Part A of this opinion, the determination of how much weight the report was entitled to was left to the discretion of the trial court.

the Agreement for Deed, that was executed by the Kings, states that "no guarantee of appreciation, resale or repurchase has been given." Tr. Ex. P–15. Further, the Property Report, which was given to the Kings at the time of execution and became a part of the real estate contract under *Kniffin v. Colorado Western Development Co.,* 622 P.2d 586 (Colo.App.1980), states "the future value of land is very uncertain; do NOT count on appreciation." Tr. Ex. P–33 at 30. Since the misrepresentation in this action related to the current value of the land, as compared to the future value, at the time of purchase it is questionable if the Kings had as much notice of the lack of authority of the agent as did the parties in *Canon City.*

The third and final distinction of *Canon City* is the most important and indicates that the Colorado Supreme Court would not take dispute with the findings of the trial court. In *Timbers v. Mitchell,* 75 Colo. 406, 226 P. 149 (1924), the Colorado Supreme Court ruled that *Canon City* did not foreclose introduction of evidence to show fraudulent inducement of a contract. According to the court, *Canon City* simply stood for the proposition that a party could not bring in the representations of an agent to "vary the contract." The Kings in this action did not seek to vary the terms of the contract between them and Horizon. Rather, the Kings brought an action in deceit for the damages they suffered due to the misrepresentations that induced them to enter that contract.

Inasmuch as it appears that the trial court's determination of the law of Colorado is correct, it is this court's determination that the trial court did not err in finding that Horizon was liable for the fraud of its agent.

**D. Calculation of Damages**

■ Horizon asserts that the trial court erred by including in the award of damages the full so-called value of the land the Kings traded in toward the purchase price of the lot they currently own.[5] The trial court stated:

> [D]amages will be allowed by the Court of the difference between what [the Kings] are either out of pocket or have paid to the defendant or what they gave to the defendant in trade ... less what the land is worth.

Tr. (Court's Findings, Conclusions, and Judgment) at 8.

The trial court ruled that the trade-in value of the lots previously owned by the Kings was $19,900, the value assigned to those lots by Horizon at the time of the

5. The trial court appears to have used the "out-of-pocket" measure of damages to calculate the Kings' damages. This measure of damage awards the difference between the value of what one has parted with and the value of what was received. Prosser on Torts, § 110, 733–34 (4th ed. 1971). A number of jurisdictions instead use what is known as the "benefit-of-the-bargain" measure of damages. See Annot., 13 A.L.R.3d 875 (1967); Prosser on Torts, § 110, 733–34 (4th ed. 1971). Under the "benefit-of-the-bargain" rule the court awards the difference between "the actual value of the property and what its value would have been had the representation been true." *Otis & Co. v. Grimes,* 97 Colo. 219, 48 P.2d 788, 791 (1935). Colorado appears to be one of the jurisdictions that uses the "benefit-of-the-bargain" measure of damages. Nonetheless, neither party objected to the use of the "out-of-pocket" measure of damages and it is, accordingly, the law of the case and will not be disturbed. *See L.B. Foster Co. v. Hurnblad,* 418 F.2d 727 (9th Cir.1969). Even if an objection had been raised, however, it is this court's opinion that the trial court was not incorrect in utilizing the "out-of-pocket" rule since, under the unique circumstances of the case before it, the "benefit-of-the-bargain" rule could not have been properly applied. To properly apply the benefit rule, it is necessary to determine what value the land would have had if the representation had been true. This value is easily determined when the representation is as to the existence, or non-existence, of an objective fact, such as, "the land has water rights," or "the house is free of termites." On the record of this case, however, there was no misrepresentation of this type, but rather, a bald statement as to the present value of the land. If a court literally applied the benefit rule and accepted blindly the misrepresentor's assertion of value as being the value of the land "had the representation been true," *Otis & Co., supra,* then the measure of damage would vary widely, dependent solely upon what the misrepresentor said the value of the land was. Such literal application of the benefit rule is neither called for nor wise.

purchase that gave rise to this action. Horizon argues that the $19,900 value was inflated since under the theory of "reloading," as presented by the Kings, Horizon would artificially increase the sales price of the land being exchanged so as to induce the other party to purchase still more expensive property. In Horizon's words: "To characterize the reloading of $19,900 as an artificial increase in one breath, and then to demand that the same $19,900 be used to measure actual loss incurred in the transaction in the next, is so blatantly inconsistent that it cannot be tolerated." Opening Brief of Defendant-Appellant at 14. Since under Colorado law a litigant may not take an inconsistent position during the litigation, *Wigton v. McKinley,* 122 Colo. 14, 221 P.2d 383 (1950), Horizon argues that the Kings ought not to be allowed credit for the $19,-900.

The trial court recognized that a potential for inconsistency existed in determining what value should be assigned the lots traded in.

> Then the question is whether they are entitled to have the credit for the $19,-900; and this is a problem also, because the $19,900 was inflated allegedly—the alleged inflated price on their lots.... My concern is whether this is an inconsistency in the plaintiffs' saying this was a proper price ... but the $75,000 figure is fraudulent—This is not the proper price.

Tr. (Court's Findings, Conclusions & Judgment) at 10. In spite of this concern, however, the trial court concluded that since Horizon itself had initially set the $19,900 price and had stated that "This is what the lots are worth," *id.,* it would be appropriate to use that figure as the proper value. This court agrees. Not only was the value initially set by the "wrongdoer," but at the trial Horizon made no effort to present evidence as to what the true value of the lots in question was at the time of the trade in. In light of such failure, on the part of Horizon, the trial court had no other figure, but the $19,900, upon which to base its judgment. The trial court's determination of damages is not clearly erroneous and will not be overturned.

In conclusion, this court is convinced that no error is demonstrated in the rulings made by the trial court on this record. Accordingly, the judgments entered are

AFFIRMED.